886 P.2d 1329

STATE of Arizona, Appellee,

v.

Willie Lee RICHMOND, Appellant.

No. CR–80–2914–AP.

Supreme Court of Arizona,
En Banc.

Dec. 15, 1994.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Section and Jack Roberts, Phoenix, for appellee.

MacDonald, Hoague & Bayless by Timothy K. Ford, Seattle, and Susan A. Kettlewell,

Pima County Public Defender by Frank P. Leto, Tucson, for appellant.

OPINION

ZLAKET, Justice.

More than twenty years ago, on February 25, 1974, Willie Lee Richmond was sentenced to death. Two decades later, Richmond is still alive and back before this court for the third time. To our knowledge, he is one of the longest-serving death row inmates in the United States. His case presents a classic example of the complex and often obscure rules governing capital sentencing schemes here and elsewhere in this country—rules that some would argue are increasingly incapable of consistent application.

This time, the United States Supreme Court has returned Richmond's case for correction of what it perceives to be constitutional error committed during our review of his second sentencing in 1983. Because of the unprecedented length of time Richmond has been on death row, this case presents unique and difficult questions. The law governing capital cases has changed significantly since his initial 1974 sentencing and, apparently, so has Richmond.

I.  Facts and Procedural History

We need not repeat the facts of this case. They are set forth in our prior opinions. *See State v. Richmond,* 114 Ariz. 186, 189, 560 P.2d 41, 44 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977) (*Richmond I* ); *State v. Richmond,* 136 Ariz. 312, 315, 666 P.2d 57, 60, *cert. denied,* 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983) (*Richmond II* ). The jury convicted Richmond of robbery and first degree murder. It returned a general form of verdict after having been instructed on both premeditated murder and felony-murder. There was no indication which theory the jurors adopted.

The trial judge sentenced Richmond to death after finding the following aggravating factors: 1) that Richmond had previously been convicted of a felony involving the use or threat of violence (kidnapping), A.R.S. § 13–703(F)(2), and 2) that he had committed the present offense in an especially cruel and heinous manner, A.R.S. § 13–703(F)(6). The judge found no statutory mitigating circumstances, and he believed at the time that the law did not permit his consideration of non-statutory mitigation.

This court affirmed in 1976. We later vacated the death sentence, however, pursuant to *State v. Watson,* 120 Ariz. 441, 445, 586 P.2d 1253, 1257 (1978), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979) (*Watson I* ), which held that it was unconstitutional to restrict mitigating circumstances to those enumerated by statute. *See also Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978).

On remand, Richmond was again sentenced to death. At his second sentencing, the trial court once more found the existence of both the (F)(2) (prior violent felony) and (F)(6) (heinous, cruel, or depraved) aggravating factors, as well as a third—that defendant had been convicted of another offense for which a sentence of life imprisonment or death was imposable (robbery and murder), A.R.S. § 13–703(F)(1). The court further found the following non-statutory mitigating circumstances: 1) that Richmond's co-defendants were involved in the offense but not charged with any crime; 2) that, near the time of the offense, the victim had engaged in an illegal act of prostitution with one of the women involved in the homicide, Becky Corella, and had solicited a similar act with Richmond's minor girlfriend, Faith Erwin; 3) that the jury had been instructed as to both premeditated murder and felony-murder; and 4) that Richmond's family was supportive and would suffer considerable grief if he were put to death. The court announced it was "unable to make a definitive finding" with respect to Richmond's changed character while in prison. Minute Order, Mar. 13, 1980, at 5. It concluded that the mitigation was not sufficiently substantial to call for leniency.

Although divided on various issues, this court affirmed Richmond's second death sen-

tence in 1983. In the principal opinion, then-Chief Justice Holohan rejected the finding that the murder was especially cruel, but found that it was heinous and depraved. He was joined by Justice Hays. Justice Cameron, joined by then-Vice Chief Justice Gordon, concurred in the sentence of death, but disagreed that the offense was especially heinous or depraved. Justice Feldman filed a dissent rejecting imposition of the death penalty. He agreed that the killing was not especially heinous or depraved, and concluded that the evidence of Richmond's changed character was sufficiently substantial to warrant a reduction to life imprisonment.

After the United States Supreme Court denied certiorari, Richmond filed a habeas corpus petition in the United States district court, which also denied relief. The Ninth Circuit Court of Appeals affirmed. The Supreme Court reversed, however, with directions to grant the petition "unless the State of Arizona within a reasonable period of time either corrects the constitutional error in petitioner's death sentence or vacates the sentence and imposes a lesser sentence consistent with law." *Richmond v. Lewis,* — U.S. —, —, 113 S.Ct. 528, 537, 121 L.Ed.2d 411 (1992). Thereafter, the state moved to set a date for resentencing in the Pima County Superior Court. Despite apparent agreement by the parties that resentencing was appropriate, the judge *sua sponte* entered an order "referring" the case to this court "for further proceedings or clarification of the record." The district court has since set a deadline of December 17, 1994 for compliance with the federal mandate.

## II. To Reweigh or Remand

■ The "constitutional error" found by the Supreme Court was that a majority of this court failed to reweigh defendant's sentence after the trial judge "gave weight to an unconstitutionally vague aggravating factor." *Richmond,* — U.S. at —, 113 S.Ct. at 537.[1] The threshold issue is whether we should correct this error or remand to the trial court. Several considerations lead us to conclude that we ought to conduct the reweighing here.

First, the language used by the Supreme Court suggests an intent that we should address the problem. Although finding that the Eighth Amendment violation arose in the second sentencing, the opinion directs that the petition be granted because of *this court's* failure to properly perform a new sentencing calculus. *Richmond,* — U.S. at —, 113 S.Ct. at 537.[2] In addition, neither the Court's directive to correct the error or reduce defendant's sentence within a "reasonable period of time," nor the district court's deadline would seem to realistically contemplate remand for a third full-blown sentencing hearing followed by review here.

Defendant nevertheless argues we should remand because of our recent holding that where there is error in the weighing process and mitigating evidence is more than *de minimus,* the trial court generally should conduct the initial reweighing. *State v. Bible,* 175 Ariz. 549, 609, 858 P.2d 1152, 1212 (1993), *cert. denied,* — U.S. —, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994). There is, however, a notable exception to the *Bible* requirement, if "the State concedes that sentence reduction is preferable to remand." *Id.* Such a concession was effectively made at oral argument in this case, where the state urged us to reimpose the death penalty but agreed

---

1. The factor, as provided for in A.R.S. § 13-703(F)(6) (especially heinous, cruel or depraved), had not yet been adequately narrowed pursuant to *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), at the time of defendant's second sentencing. This did not occur until *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). *See Lewis v. Jeffers,* 497 U.S. 764, 784, 110 S.Ct. 3092, 3104, 111 L.Ed.2d 606 (1990) (holding that *Gretzler* accomplished such a narrowing).

2. Because Justices Cameron and Gordon eliminated an aggravating factor in *Richmond II,* they needed to reweigh the remaining factors against the mitigating evidence to ensure continuing constitutional validity of the death sentence. *Clemons v. Mississippi,* 494 U.S. 738, 739, 110 S.Ct. 1441, 1443, 108 L.Ed.2d 725 (1990). In the absence of any mention by those two justices of the evidence in Richmond's favor, the high court would not presume reweighing had occurred. *Richmond,* — U.S. at — - —, 113 S.Ct. at 535-36.

that if unable do so we should reduce rather than remand for yet another sentencing hearing.[3]

The state observes that remand would almost certainly result in an additional round of appeals,[4] thus raising concerns under the Victims' Bill of Rights. Ariz. Const. art. 2, § 2.1. One of the guarantees afforded by that constitutional amendment is a "prompt and final conclusion of the case after the conviction and sentence." *Id.* § 2.1(A)(10). We agree that if this provision is to have meaning, victims are entitled to closure much sooner than 25 or 30 years after their perpetrators' convictions, although we cannot be sure they would generally support sentence reduction as a means to this end. On the other hand, even though capital prisoners should not be permitted to "benefit from the ultimately unsuccessful pursuit of [constitutional] rights," *Richmond v. Lewis*, 948 F.2d 1473, 1492 (9th Cir.1990), *rev'd,* —— U.S. ——, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992), delay resulting from meritorious challenges, as in this case, certainly cannot be held against them.

Richmond, meanwhile, urges us to consider the extraordinary length of time he has been on death row. If we remand and he is again sentenced to death, it could take five to ten years for completion of another appellate cycle.[5] In other words, the ultimate penalty would be imposed, if at all, almost three decades following commission of the crime. Such a delay is nearly unprecedented in this country. Defendant argues that execution

after such a lengthy term of confinement on death row would constitute cruel and unusual punishment under the Eighth Amendment of the United States Constitution and article 2, § 15 of the Arizona Constitution. He claims that because such a punishment is tantamount to "torture [and] lingering death," it is "cruel" within the meaning of *In re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1889). *See also* Robert Johnson & John L. Carroll, *Litigating Death Row Conditions: The Case for Reform, in Prisoners & the Law* 8–3 (I. Robbins ed., 1988) (quoting Robert Johnson, *Under Sentence of Death: The Psychology of Death Row Confinement,* 5 L. & Psychol. Rev. 141 (1979)) (providing empirical evidence for psychological pain caused by prolonged confinement on death row); Louis J. West, *Psychiatric Reflections on the Death Penalty, reprinted in Capital Punishment in the United States* 421–22 (Hugo A. Bedau & Chester Pierce eds., 1976) (same). Concern over this question has not been limited to the American experience. The British Judicial Committee of the Privy Council recently stated:

> There is an instinctive revulsion against the prospect of hanging a man after he has been held under sentence of death for many years. What gives rise to this instinctive revulsion? The answer can only be our humanity; we regard it as an inhuman act to keep a man facing the agony of execution over a long extended period of time.

*Pratt v. Attorney Gen. of Jamaica,* [1993] 4 All E.R. 769, 783 (P.C.) (appeal taken from Jam.).

---

3. We note that a newly-enacted statute, while not controlling, reflects a policy consistent with the state's position in this case. *See* A.R.S. § 13–703.01(A) and (B) (effective July 17, 1994) (providing for broad independent review of death sentences by this court).

4. Such a scenario is especially likely here, because at resentencing the state would reassert its argument that defendant killed for pecuniary gain. *See* A.R.S. § 13–703(F)(4). It alleged this factor at defendant's previous sentencing hearings, but the trial judge refused to find it, believing that the (F)(4) factor applied only to "murder for hire" situations. The law has since been interpreted to include other types of pecuniary gain. *See, e.g., State v. Clark,* 126 Ariz. 428, 436,

616 P.2d 888, 896, *cert. denied,* 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). Also, we held in *Gretzler* that the state may attempt to establish new aggravating circumstances at resentencing if the law has been substantially clarified since the original sentencing. 135 Ariz. at 49, 659 P.2d at 8. This practice was upheld by the United States Supreme Court in *Poland v. Arizona,* 476 U.S. 147, 155–57, 106 S.Ct. 1749, 1755–56, 90 L.Ed.2d 123 (1986).

5. The resentencing process might be even more time-consuming and difficult here because the original trial judge, Hon. Richard Roylston, is now deceased. Therefore, another judge would have to review the voluminous record in this case.

## III. Independent Review

■ It is against this backdrop of competing interests that we endeavor to dispassionately review and reweigh the evidence. Fortunately, we need not decide the foregoing constitutional issues in disposing of this case. As our analysis demonstrates, capital sentencing law has undergone significant change since Richmond committed his offense. The resulting legal maze makes it troublesome for us to reaffirm his death sentence in a sensible and nonarbitrary manner.[6] This difficulty, together with evidence that defendant has apparently changed since his crime, persuades us that we should reduce his sentence to life in prison and bring an end to this unfortunate saga.

### A. Aggravating Factors

We begin our re-examination with those findings made at the second sentencing hearing. The trial judge found three aggravating factors. Of those, two present serious problems.

#### 1. Prior Violent Felony

■ This aggravating factor (prior felony involving the use or threat of violence on another, A.R.S. § 13–703(F)(2)) stems from a 1970 kidnapping conviction. Defendant claims the factor is invalid here under our cases requiring that such a conviction be predicated on a statute in which the use or threat of violence is a necessary element of the crime. *See, e.g., State v. Henry,* 176 Ariz. 569, 587, 863 P.2d 861, 879 (1993); *State v. Romanosky,* 162 Ariz. 217, 228, 782 P.2d 693, 704 (1989); *State v. Gillies,* 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983). We agree. In *Henry,* we repeated our holding that "[t]he statutory definition of the prior

crime, and not its specific factual basis, dictates whether an aggravating circumstance exists under A.R.S. § 13–703(F)(2)." 176 Ariz. at 587, 863 P.2d at 879. In *State v. Arnett,* we defined "violence," as used in § 13–703(F)(2), to be the "exertion of any physical force so as to injure or abuse." 119 Ariz. 38, 51, 579 P.2d 542, 555 (1978). We later explained that a defendant must have *used or threatened* force with the intent to injure or abuse. *State v. Fierro,* 166 Ariz. 539, 549, 804 P.2d 72, 82 (1990) (emphasis added).

■ A number of considerations lead us to conclude that this aggravating factor does not apply here. First, the trial court, over the objection of defense counsel, improperly received testimony concerning the facts of the offense. The elements of the underlying statute, however, are determinative of such an inquiry. As we held in *Gillies,* and again in *Romanosky,* "[w]e cannot allow what is, in effect, a second trial on defendant's prior convictions to establish the existence of an A.R.S. § 13–703(F)(2) aggravating circumstance." *Romanosky,* 162 Ariz. at 228, 782 P.2d at 704 (quoting *Gillies,* 135 Ariz. at 511, 662 P.2d at 1018). The remaining evidence presented to the trial court regarding this factor was insufficient. The state introduced copies of the information charging defendant with the crime and the sentencing minute order, both of which recited that defendant kidnapped the victim "while armed with a deadly weapon, ... a knife." Neither document, however, referred to a specific portion of the kidnapping statute that would necessarily involve violence. Because the formal record of conviction was, for unknown reasons, never introduced, we do not know whether defendant was in fact convicted under any such section of the statute.

---

**6.** Justice Scalia, dissenting in this case, laments what he calls "mandated arbitrariness" as well as "an impenetrable complexity and hence a propensity to error that make a scandal and a mockery of the capital sentencing process." *Richmond v. Lewis,* —— U.S. at ——, 113 S.Ct. at 538. We have experienced some of what he describes in our attempts to cope with the sentencing issues here. We are also mindful of

Justice Blackmun's recent dissent in *Callins v. Collins,* —— U.S. ——, ——, 114 S.Ct. 1127, 1130, 127 L.Ed.2d 435 (1994), where he warns "[t]he problem is that the inevitability of factual, legal and moral error gives us a system that we know must wrongly kill some defendants, a system that fails to deliver the fair, consistent, and reliable sentences of death required by the Constitution."

Former A.R.S. § 13–491, the kidnapping statute at issue, is of little help in determining whether the trial court's finding that defendant was armed necessarily means he used or threatened force. Section (D) provides sentence enhancement for crimes "prescribed by the terms of subsections A and B, committed by a person armed with a gun or other deadly weapon." Both subsections encompass ways in which kidnapping could occur without the use or threat of violence. Subsection (A)(3) includes kidnapping "by false promises," while (B) refers to "tak[ing] by force *or fraud.*" (Emphasis added). Thus, it is possible that the reference to a knife in this case was made only for enhancement purposes. In other words, a person could commit this offense and receive an enhanced sentence under (D) without actually using or threatening violence—that is, he could kidnap the victim in a nonviolent way while having a deadly weapon on his person. Because there is no way to resolve this question without looking to extrinsic evidence, we agree with defendant that this prior conviction cannot be used in aggravation against him.

## 2. Especially Heinous, Cruel or Depraved

The second problematic factor is (F)(6)— "that defendant committed the offense in an especially heinous, cruel or depraved manner." As we stated in *Gretzler,* "cruelty involves the pain and distress visited upon the victims, and ... heinous and depraved go to the mental state and attitude of the perpetrator as reflected in his words and actions." 135 Ariz. at 51, 659 P.2d at 10. The finding of cruelty was rejected in 1983 by a majority of this court which noted that "there is no evidence in the record to indicate the victim suffered more pain than that of the initial blow which rendered him unconscious." *Richmond II,* 136 Ariz. at 319, 666 P.2d at 64; *see also State v. Medrano,* 173 Ariz. 393, 397, 844 P.2d 560, 564 (1992) (finding of "cruelty" cannot be supported in absence of conclusive evidence that victim was conscious before death).

Furthermore, although the author of *Richmond II* found the murder to be heinous and depraved, three members of the court concluded otherwise. 136 Ariz. at 322–26, 666 P.2d at 67–71 (Cameron and Gordon, JJ., concurring and Feldman, J., dissenting). The principal opinion based its conclusion on two *"Gretzler* factors"—infliction of gratuitous violence and needless mutilation of the victim. *Richmond II,* 136 Ariz. at 319, 666 P.2d at 64; *see also Gretzler,* 135 Ariz. at 52–53, 659 P.2d at 11–12 (listing five factors that help determine whether a murder is heinous or depraved). We note, however, that the evidence has never been clear regarding who drove the vehicle over the victim. Although Faith Erwin testified that defendant was driving, she admitted that she was severely drugged with heroin at the time, was vomiting during the main incident, and was lying down on the back seat with her eyes closed when the other two got into the car and drove away. Furthermore, a defense witness stated that Erwin had previously identified Corella as the driver. Richmond also claimed Corella was the driver in a post-arrest statement in which he acknowledged robbing the victim. Neither Corella nor Richmond testified at trial.

Even assuming defendant drove, it is questionable whether this incident involved the infliction of "gratuitous violence," as that phrase has been used by us in the past. *See State v. Ceja,* 115 Ariz. 413, 417, 565 P.2d 1274, 1278, *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977) (defendant's "barrage of violence, inflicting wounds and abusing his victims ... beyond even the point necessary to kill," indicated heinousness and depravity). Although the Supreme Court here stated that, for federal constitutional purposes, "[a] murderer who *intentionally* drives a car over his victim twice *arguably* commits 'gratuitous violence' within the meaning of *Gretzler,* whether or not he knows that the victim is dead after the first pass," *Richmond,* —— U.S. at ——, 113 S.Ct. at 536 (emphasis added), it did not decide whether the evidence in this case justified such a finding. As previously indicated, a majority of this court in 1983 believed it did not, and we now concur.

■ Furthermore, there is no evidence that defendant committed distinct acts, apart from the killing itself, with the purpose of mutilating the victim. Although the body here was disfigured, we agree with the concurring justices in *Richmond II* that "mutilation" requires an "indication of a separate purpose to mutilate the corpse." *Richmond II*, 136 Ariz. at 323, 666 P.2d at 68; *see also State v. Jimenez*, 165 Ariz. 444, 455, 799 P.2d 785, 796 (1990) (numerous post-mortem stab wounds indicated needless mutilation and use of gratuitous violence); *State v. Vickers*, 129 Ariz. 506, 515, 633 P.2d 315, 324 (1981) (defendant's carving of word "Bonzai" in victim's back after killing him supported finding of depravity).

### 3. Prior Conviction for Which Life or Death Imposable

Thus, the only solid aggravator in this case is the "prior" murder conviction. *See* A.R.S. § 13–703(F)(1) ("defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable"). Defendant was not actually convicted of that crime until several months *after* his conviction for the offense at issue here, but this aggravating circumstance was added at defendant's second sentencing hearing.

### B. Mitigating Circumstances

■ We agree with defendant that the mitigation here is more than *de minimis*.

There is significant evidence of his changed character. *See State v. Watson*, 129 Ariz. 60, 63–64, 628 P.2d 943, 946–47 (1981) (*Watson II*) (evidence of rehabilitation should be considered in mitigation).[7] Because we also agree that this crime does not stand out "above the norm of first degree murders," the question becomes whether defendant rises "above the norm of first degree murderers." *See Richmond II*, 136 Ariz. at 323, 666 P.2d at 68 (Cameron and Gordon, JJ., concurring). Moreover, because "the imposition of the death penalty in this case is clearly based upon the character of the defendant," evidence of his changed nature is particularly relevant to our inquiry. *Id.* at 324, 666 P.2d at 69 (Feldman, J., dissenting). Our present chief justice believed more than a decade ago that this evidence was compelling enough to warrant the reduction of defendant's sentence to life. *Id.* at 326, 666 P.2d at 71. Although a majority of the *Richmond II* court disagreed and declined to consider it in mitigation, the reasons provided for this refusal cause us to re-examine the evidence and make an independent determination.[8]

### 1. Defendant's Changed Character

Contrary to the rather inconclusive evaluation reached by the trial court, we find the testimony and other evidence presented on this issue quite persuasive and most unusual for a capital case. Numerous witnesses testified that Richmond's attitude had improved significantly; that he had taught himself to

---

7. The state implies that Richmond only "changed" because he had "much to gain" from behaving well in prison. We note, however (as did the *Richmond II* dissent) that defendant's change in behavior and attitude occurred long before *Watson II* was decided.

8. This court's 1983 opinion variously indicates that the sentencing judge considered the evidence "but found it unpersuasive;" that he "was not convinced that appellant's character had changed;" and that he "was unable to make a definitive finding." *Richmond II*, 136 Ariz. at 320–21, 666 P.2d at 65–66. In fact, the sentencing judge stated only the latter.

We disagree with the state's contention that the "law of the case" doctrine prevents us from reevaluating this mitigating factor. Such a self-imposed judicial constraint is designed to pro-

mote judicial efficiency, *see, e.g., Ex parte Granger*, 850 S.W.2d 513, 516 (Tex.Crim.App.1993), but not at the expense of justice, *see People v. Medina*, 6 Cal.3d 484, 492, 99 Cal.Rptr. 630, 635, 492 P.2d 686, 691 (1972) (the doctrine will not be applied where to do so would result in an unjust decision). It prevents a court from reconsidering issues of law previously decided. *People v. Shuey*, 13 Cal.3d 835, 841, 120 Cal.Rptr. 83, 88, 533 P.2d 211, 216 (1975). The question here is not a legal one, however, but concerns instead this court's understanding of the record when it last considered the mitigating evidence. Furthermore, because application of the doctrine in these circumstances could result in extreme injustice and imposition of the ultimate penalty, we will not refuse to re-examine the prior determination.

read, write, and type; and that he had used these newly found skills as tools both for his own spiritual growth and to help others inside and outside the prison system. Some of the most compelling testimony came from prison counselors and guards, who stated that Richmond's efforts at rehabilitation were sincere. They gave specific examples of how he had bettered himself and helped others. Fourteen years have passed since Richmond's last sentencing hearing. He alleges, and the state does not disagree, that if we were to remand for a third hearing, the defense would introduce much more evidence of the same kind.

The state correctly argues that defendant's other murder conviction, for which he received a life sentence, is a serious aggravating factor that cannot be ignored. We note, however, that because the two killings occurred in close proximity (approximately one month apart), the evidence of defendant's changed character also necessarily impacts the weight of the (F)(1) factor here. If defendant has indeed changed, as the evidence strongly suggests, he is no longer the same person he was when he committed either of these crimes.

### 2. Other Potential Mitigating Circumstances

█ Just as the state, in the event of a remand, would attempt to take advantage of more recent developments in the law, *see, e.g.,* footnote 4, *supra,* defendant argues that he would be entitled to present evidence of his significant psychological disability at the time of the murder.[9] This condition, he claims, was enhanced by his alleged drug addiction. *See* A.R.S. § 13–703(G)(1) (formerly A.R.S. § 13–454(F)(1)) (mitigating circumstance present if defendant's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution"). Psychological evidence was not considered at the second sentencing, because we had held in *Richmond I* that only a "significant mental disorder" qualifies as a statutory mitigating factor. 114 Ariz. at 198, 560 P.2d at 53. However, the law now requires that a mental disorder be at least considered, whether or not it rises to the level of a statutory mitigating factor, and even though it may ultimately be rejected as insufficient to justify leniency. *See State v. Brewer,* 170 Ariz. 486, 505, 826 P.2d 783, 802, *cert. denied,* —— U.S. ——, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992).

Moreover, the record suggests that defendant may have been impaired by drugs at the time of the killing. In *Richmond I,* this court held that only a "mental disease or defect" could be considered in mitigation. 114 Ariz. at 197, 560 P.2d at 52. We did not interpret this factor to include impairment by intoxication until June of 1980, three months after defendant's second sentencing. *See State v. Jordan,* 126 Ariz. 283, 290 n. 5, 614 P.2d 825, 832 n. 5, *cert. denied,* 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980).[10] Thus, defendant's drug use and its possible connection to these crimes was neither considered nor argued in mitigation.

For obvious reasons, the potential evidence at a rehearing cannot be evaluated as part of our present reweighing. It serves to remind us again, however, that because capital sentencing laws have changed significantly over the years, this case is now engulfed in a quagmire of complexity.[11]

---

9. Defendant notes that he has never had the benefit of an independent psychological examination because of limited resources for indigent capital defendants at the time of his earlier sentencing.

10. Although the statutory definition of "significant impairment" arguably covered intoxication during defendant's second sentencing, we noted in *Jordan* that *Richmond I* implied otherwise and that it was not until *Watson I,* 120 Ariz. at 445, 586 P.2d at 1257, that we required all mitigating circumstances to be considered. *See Jordan,* 126 Ariz. at 290 n. 5, 614 P.2d at 832 n. 5.

11. There may be an additional sentencing concern. The jury was instructed as to both premeditated murder and felony-murder. In *Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 3378–79, 73 L.Ed.2d 1140 (1982), it was

C. Reduction of Sentence to Life Imprisonment

Having reexamined and reweighed aggravating and mitigating factors to the fullest extent possible, we find that the mitigation here is sufficiently substantial to call for leniency. We hereby reduce defendant's death sentence to life imprisonment, and in doing so agree with the state that such a result is preferable to a remand followed by additional appeals. It is clearly time to bring this matter to an end.

The life term existing at the time of Richmond's present offense, and the one we must impose, is natural life "without possibility of parole for twenty-five calendar years." 1973 Laws ch. 138, § 2 (effective August 8, 1973). While awaiting execution, Richmond has been serving a concurrent life sentence for his "prior" murder conviction. The life sentence we now impose is to be served consecutively to that one. *See Fierro*, 166 Ariz. at 557, 804 P.2d at 90. Thus, he will not be eligible for parole in this matter until twenty-five years after parole, if any, is granted on his first life sentence. We reduce defendant's death sentence, however, with the expectation and strong recommendation that he remain incarcerated for the remainder of his natural life and never receive parole.

FELDMAN, C.J., MOELLER, V.C.J., and CORCORAN and MARTONE, JJ., concur.

held that before the death penalty can be imposed there must be a finding that defendant killed, intended to kill, or attempted to kill. This court purported to conduct an independent *Enmund* analysis in 1983, after which the majority stated that "the trial judge was justified in concluding that appellant drove the vehicle that was used to kill the victim." *Richmond II*, 136 Ariz. at 318, 666 P.2d at 63. We are unable to locate any place in the record where the trial court made such a finding, or even one that defendant intended to kill, presumably because the sentenc-

ing was pre-*Enmund* and the judge saw no need to do so. Moreover, in *Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), the court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." Although the facts here arguably demonstrate such recklessness, a question exists as to whether defendant could be executed without first having been given an opportunity to present evidence on the issue. Given our ultimate resolution of this case, we need not decide the question.