974 P.2d 431

STATE of Arizona, Appellee.

v.

Todd Lee SMITH aka Tom Steel, Appellant.

No. CR–97–0389–AP.

Supreme Court of Arizona,
En Banc.

Feb. 23, 1999.

Janet A. Napolitano, Attorney General by Paul J. McMurdie, Chief Counsel Criminal Appeals Section, Kent E. Cattani, Assistant Attorney General, Phoenix, for the State of Arizona.

H. Allen Gerhardt, Coconino County Public Defender, Flagstaff, for Todd Lee Smith.

OPINION

MARTONE, Justice.

¶ 1 A jury convicted Todd Lee Smith of two counts of first-degree murder (both premeditated and felony murder for each count), armed robbery, and first-degree burglary. The trial court sentenced him to death for the murder convictions, and to consecutive eighteen-year prison terms for the noncapital crimes. Appeal to this court is automatic under Rules 26.15 and 31.2(b), Ariz. R.Crim. P., and direct under A.R.S. § 13–4031. We affirm.

## I. BACKGROUND

¶ 2 During the summer of 1995, Clarence "Joe" Tannehill, 72, and Elaine, his 73–year-old wife, were camping near Ashurst Lake, approximately twenty miles from Flagstaff. They arrived at the campsite in their truck and travel trailer on July 26, 1995.

¶ 3 Todd Lee Smith arrived at the Ashurst campground on July 21, 1995 with his mother, Judy Smith, and four-year-old son in a motor home and car. The three were living in the motor home. Smith had been unemployed for some time and Judy supported all three with her Social Security income.

¶ 4 On July 31, 1995, after a quarrel, the Smiths left Ashurst separately. Later that same day, Todd Smith and his son returned to Ashurst in the motor home. He had no money. When he arrived, he checked in and gave the campground hosts the name "Tom Steel" and an incorrect license plate number.

¶ 5 The next evening, August 1, Smith went to the Tannehills' trailer armed with a gun and knife. His hand was wrapped in his son's T-shirt to feign an injury as a ruse to get into the trailer. Once Smith was inside, Mr. Tannehill grabbed for the gun and it went off. Smith then struck the Tannehills repeatedly with the gun. Although both had already died from blunt-force head injuries, he also cut their throats. Mrs. Tannehill also had bruises and lacerations on her arms and upper body, which the medical examiner characterized as defensive wounds.

¶ 6 Smith took Mr. Tannehill's wallet from his back pocket and emptied Mrs. Tannehill's purse on the bed. He took cash, but left credit cards. He also took a white television set, seven necklaces, and approximately $130. Smith said he struck them first, took the items, and when he thought they were getting up, struck them again and slit their throats.

¶ 7 The Tannehills' bodies were not discovered until August 3, 1995, when neighboring campers grew concerned over not having seen the Tannehills for a couple of days. By this time, Smith and his son had gone to Phoenix and were staying with friends.

¶ 8 When Smith arrived in Phoenix on the morning of August 2, he told his friends he had just come from Louisiana. Smith asked one of his friends to sell a pearl necklace for him, which he said had belonged to his grandmother. Smith stayed with these friends and parked his motor home behind a gas station. After Smith saw his picture on the news in connection with the Tannehill murders, he removed the license plate from the motor home. He was also seen leaving the motor home with a green trash bag, which police later recovered in a nearby dumpster. The bag contained a bloodstained handgun and knife, and bloody clothing. Both Tannehills' blood was on the gun and clothing, Mr. Tannehill's blood was on the knife, and Smith's blood was also on the clothing. After obtaining a search warrant for the motor home, the police discovered the Tannehills' television set and six necklaces.

¶ 9 After a friend reported him to the police, Smith was arrested at a Denny's restaurant during the early morning hours of August 6. Phoenix police held Smith until the investigating detective, Michael Rice, arrived from Flagstaff. The Phoenix police did not interrogate him and did not give him warnings under *Miranda*. They only held him until the Coconino authorities came to pick him up.

¶ 10 While waiting for Detective Rice to arrive, Smith engaged in small talk with the Phoenix officers. During one of these conversations with Officer Maish, Smith made some incriminating statements regarding his motor home, meeting the Tannehills, and his drug use. When Detective Rice arrived, he gave Smith the warnings required by *Miranda* and conducted and videotaped the first interrogation. Smith waived his *Miranda* rights and agreed to talk. When the detective told Smith that they had found the bloody weapons and clothes, Smith invoked his right to a lawyer and the interrogation stopped.

¶ 11 At the end of the first interrogation, Detective Rice prepared to take Smith to Flagstaff. Just before leaving the police station, Smith said to Detective Rice, "I don't see why I shouldn't just tell you." Tr. Apr. 15, 1997 at 149. This statement was not recorded. However, once in the car, Detective Rice hooked up a tape recorder and clarified that Smith's statement meant that he wanted to speak to the police after all. While en route to Flagstaff, Smith admitted robbing the Tannehills and hitting them with the gun. Smith's final interrogation occurred as soon as they arrived in Flagstaff, during which Smith provided a summary of the events that took place in the Tannehills' trailer.

## II. ISSUES

Smith raises the following issues:

### A. Trial Issues

1. Did the trial court commit clear and manifest error in determining that Smith's statements were admissible at trial?

2. Did the premeditation instruction in this case constitute reversible error?

### B. Sentencing Issues

1. Is the Arizona death penalty unconstitutional on its face and/or as applied in this case?

## III. ANALYSIS

### A. TRIAL ISSUES

#### 1. ADMISSIBILITY OF SMITH'S STATEMENTS

¶ 12 Smith argues that the court erred in not suppressing his statements to the police in violation of the Fifth and Sixth Amend-

ments to the United States Constitution and Article 2, Sections 10 and 24 of the Arizona Constitution. Within that general argument, Smith appears to make several sub-arguments: his statements were not voluntary, the police violated *Miranda*, he did not reinitiate contact after requesting counsel, and his right to counsel was violated.

### a. Voluntariness

¶ 13   Smith argues that the court erred in admitting his statements because they were made either while he was under the influence of methamphetamines or while experiencing withdrawal symptoms. This argument appears to challenge the voluntariness of his statements.

¶ 14   Because confessions are presumed involuntary, the state must show by a preponderance of the evidence that a confession was voluntary. *State v. Scott*, 177 Ariz. 131, 136, 865 P.2d 792, 797 (1993). The trial court's ruling will not be reversed absent clear and manifest error. *Id.* The court will look at the totality of the circumstances to determine " 'whether police conduct constituted overreaching.' " *Id.* (quoting *State v. Stanley*, 167 Ariz. 519, 524, 809 P.2d 944, 949 (1991)). "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' ...." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). When evaluating coercion, the defendant's physical and mental states are relevant to determine susceptibility to coercion, but alone are not enough to render a statement involuntary. *State v. Tucker*, 157 Ariz. 433, 445, 759 P.2d 579, 591 (1988).

¶ 15   The trial court conducted a four-day suppression hearing on the voluntariness of Smith's statements and found all statements made after he arrived at the Phoenix police station were admissible. While there is some evidence that Smith may have consumed methamphetamine shortly before his arrest, the police did not perceive Smith to be under the influence of or withdrawing from drugs. In addition, Smith himself told Officer Maish that he had not consumed drugs for a couple of days before his arrest. Smith did not behave in a bizarre or unusual way. His speech was clear. He was not unkempt. He was not hysterical, hallucinating, or disoriented. On the contrary, he was friendly and cooperative. Smith appeared to understand his discussions with police, was aware of his rights, and could communicate. The police did not threaten, intimidate, or make promises to induce him to speak. No evidence exists that police conduct coerced him to speak.

¶ 16   In addition, Smith understood the meaning of his statements. *Tucker*, 157 Ariz. at 446, 759 P.2d at 592. For example, Smith invoked his right to a lawyer during his first interrogation when the detective presented him with incriminating evidence. Thus, he was able to understand the inculpatory nature of the evidence and the need to protect himself by invoking his rights. We affirm the trial court's ruling that Smith's statements were voluntary.

### b. *Miranda*

¶ 17   Smith argues that the first statements he made while in custody were in violation of *Miranda* because they were made after he was in custody but before he was advised of his rights. It is not clear from Smith's Opening Brief to which statements he is referring. However, the only inculpatory statements were those made to Officer Maish, so we address them.

¶ 18   *Miranda*'s procedural safeguards apply only to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 292, 100 S.Ct. 1682, 1685, 64 L.Ed.2d 297 (1980).

¶ 19   Officer Maish did not give Smith *Miranda* warnings because he had no intention of conducting an interrogation. His responsibility was simply to watch Smith while waiting in an unsecured holding room

until Detective Rice arrived from Flagstaff. While sitting with Smith, they engaged in small talk about Colorado and elk hunting. Smith told Officer Maish he removed the license plate from his motor home and admitted meeting the Tannehills. He also talked about his ex-wife and her drug problems, as well as his own "casual" use of methamphetamine, stating that he had used the drug two days earlier. During the course of the conversation, Officer Maish told Smith he did not look well for his age and that such an appearance is usually caused by sickness or drug use. Smith said that he was not an addict just because he had some methamphetamine. Officer Maish responded, "What meth?" Tr. May 29, 1996 at 134. Smith then produced a small amount of the drug from his pants pocket.

¶ 20 The evidence supports the trial court's finding that Officer Maish did not interrogate Smith. His statements and questions were in response to Smith's questions and conversation. None of Officer Maish's statements rise to the level of *Innis*-type questions—those designed to elicit incriminating responses. As the trial court stated, Officer Maish's statements "were not made ... with the expectation that they would lead to incriminating statements by the defendant." Minute Entry, Mar. 20, 1997. We affirm the trial court's ruling.

### c. Statements Made After Smith Requested Counsel

¶ 21 Smith argues that his statements to Detective Rice should have been suppressed because they were made after Smith had requested a lawyer, and Smith had not reinitiated contact with the police.

■ ¶ 22 When a suspect invokes his right to a lawyer, all questioning must cease. *Edwards v. Arizona*, 451 U.S. 477, 481, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981). However, if the suspect reinitiates contact with the police, he waives his rights and questioning can continue. *Oregon v. Bradshaw*, 462 U.S. 1039, 1043–44, 103 S.Ct. 2830, 2833–34, 77 L.Ed.2d 405 (1983); *State v. Burns*, 142 Ariz. 531, 535, 691 P.2d 297, 301

(1984) (holding that defendant reinitiated contact when he said, "Well, I want to tell you what happened."). In *Bradshaw*, the Court held that the defendant's question, "Well, what is going to happen to me now?" evidenced "a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1045, 103 S.Ct. at 2835. Thus, the defendant in that case reinitiated contact after invoking his right to a lawyer.

■ ¶ 23 Likewise, in this case, Smith said, "I don't see why I shouldn't just tell you." Tr. Apr. 15, 1997 at 149. This, too, showed a desire for a discussion about the investigation. Detective Rice removed any doubt as to Smith's intent by clarifying that Smith's statement was an indication that he now wanted to speak.

¶ 24 Smith asserts that his confessions to the police were made after he requested counsel and that he did not reinitiate contact. However, it is not clear if he is arguing 1) that he did not reinitiate contact because he never said, "I don't see why I shouldn't just tell you," or 2) even if he said it, the police initiated contact first, or 3) that even if he said it, the statement did not rise to the level of one intended to reinitiate contact.[1] At all events, we cannot agree that Smith did not reinitiate contact.

¶ 25 First, during the suppression hearing, Smith neither admitted nor denied saying, "I don't see why I shouldn't just tell you." Rather, he stated that he did not recall making the statement. Tr. May 31, 1996 at 157. Although this statement was not recorded, Detective Rice immediately wrote it in his notebook. In addition, after setting up a recorder, Detective Rice asked Smith if his earlier statement meant that he wanted to talk to them after all—he did not simply resume questioning. Smith did not ask, "What earlier statement?" or express confusion over the detective's question. It is reasonable to infer that Smith did make the statement and thus reinitiated contact with the police.

¶ 26 Second, no evidence exists, except Smith's own assertion, that Detective Rice was the one who reinitiated the contact.

---

1. These three arguments were made in Smith's Motion to Suppress at trial.

Third, Detective Rice stopped questioning and ended the first interrogation after Smith invoked his right to counsel. After being transferred downstairs to the car, Smith said to Rice, "I don't see why I shouldn't just tell you." Tr. Apr. 15, 1997 at 149. As we have already stated, this statement indicated a desire to discuss the investigation. Therefore, Smith did intend to reinitiate contact and waive his rights. His statements are admissible.

### d. Right to Counsel

¶ 27 Smith appears to assert that his right to counsel was violated when the police questioned him without a lawyer because judicial proceedings had been initiated against him. He does not argue this point, but merely states, "It should also be noted that a complaint had been filed against Appellant prior to his arrest. The filing of the complaint entitled Appellant to the appointment of counsel." Appellant's Opening Br. at 8.

¶ 28 We need not decide whether the filing of a complaint initiates adversary judicial proceedings. *See* Ariz. R.Crim. P. 2.2. Even if Smith was entitled to counsel, he waived the right after receiving *Miranda* warnings and, thus, his statements to Detective Rice are admissible.

¶ 29 After the Sixth Amendment right to counsel attaches, the accused can waive this right and speak to police without counsel present. *Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (holding statements from post-indictment questioning without counsel admissible, and rejecting the argument that the Sixth Amendment right to counsel prohibits the police from initiating questioning even if the accused did not request counsel). If the accused has been given his *Miranda* warnings and makes a voluntary, knowing, and intelligent waiver of those rights, the statements are admissible. *Id.* at 292–94, 108 S.Ct. at 2394–96. However, when the police initiate questioning, a waiver of the right to counsel is only valid if the accused has not yet asked for a lawyer. *Id.* at 291, 108 S.Ct. at 2394. The analysis, therefore, mirrors the *Miranda* analysis we have already done.

¶ 30 When a suspect invokes his right to a lawyer, all questioning must cease. *Edwards v. Arizona,* 451 U.S. 477, 481, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981). However, if the suspect reinitiates contact with the police, he waives his rights and questioning can continue. *Oregon v. Bradshaw,* 462 U.S. 1039, 1043–44, 103 S.Ct. 2830, 2833–34, 77 L.Ed.2d 405 (1983); *see also Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85. In the Sixth Amendment context, the *Edwards* analysis applies—after the accused requests counsel, a subsequent waiver must not be based on police-initiated questioning, but must be defendant-initiated. *Michigan v. Jackson,* 475 U.S. 625, 635–36, 106 S.Ct. 1404, 1410–11, 89 L.Ed.2d 631 (1986) (holding postarraignment questioning of an accused who requested counsel at the arraignment invalid). Furthermore, once the suspect has waived his rights, he is always free to re-invoke them.

¶ 31 In this case, Smith was given the *Miranda* warnings by Detective Rice before he was questioned. Smith said, "I've—I've got no problem talking to you." State Ex. 171, Det. Rice Interview at Phoenix Police Station at 2. Thus, Smith initially waived his rights. After Smith was confronted with incriminating evidence during questioning, he stated, "I want a lawyer—I—I need a lawyer I guess—if you guys think I did this, I need a lawyer." *Id.* at 20. Smith was aware of his rights, as evidenced by his invoking them during the interrogation. Questioning ceased when Smith stated unequivocally his desire for a lawyer. Smith then waived his right to a lawyer when he reinitiated contact with the statement, "I don't see why I shouldn't just tell you." Tr. Apr. 15, 1997 at 149. There was no Sixth Amendment violation. Smith's statements to Detective Rice are admissible.

¶ 32 In addition, Smith's statements to Officer Maish, made before he received his *Miranda* warnings, are admissible even if his Sixth Amendment right to counsel had attached. " '[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating

statements from the accused after the right to counsel has attached.'" *Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986) (quoting *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985)). *Kuhlmann* held that the Sixth Amendment did not forbid admitting postarraignment statements made to a jailhouse informant who did not question or otherwise deliberately elicit information from the defendant. *Id.* The defendant's statements were "spontaneous" and "unsolicited." *Id.* at 460, 106 S.Ct. at 2630.

¶ 33 For the same reason that the admission of Smith's statements to Officer Maish did not violate *Miranda,* it did not violate the Sixth Amendment. Officer Maish did not interrogate Smith, nor did he use any tactics designed to elicit information. Smith's statements to Officer Maish were unsolicited. He engaged in casual conversation with Officer Maish and incriminated himself in the process. His statements to Officer Maish are also admissible.

## 2. PREMEDITATION INSTRUCTION

¶ 34 Smith argues that the premeditation instruction and closing argument given in this case constitute reversible error because they allowed the jury to find premeditation without finding actual reflection. Smith relies on *State v. Ramirez,* 190 Ariz. 65, 945 P.2d 376 (App.1997), which held that A.R.S. § 13–1101(1), defining "premeditation," requires actual reflection. The state argues that *Ramirez* was incorrectly decided, or in the alternative, that it is distinguishable on its facts from this case.

¶ 35 There is a conflict in the Arizona Court of Appeals over whether premeditation requires actual reflection or a length of time to permit reflection. *See State v. Haley,* 287 Ariz. Adv. Rep. 3, —— Ariz. ——, —— P.2d ——, 1998 WL 514322 (App.1998) (holding the plain language of the statute does not require actual reflection and noting that after *Ramirez,* the legislature modified the statute, which now states that "[p]roof of actual reflection is not required," 1998 Ariz. Sess. Laws Ch. 289, § 6 (effective Aug. 21, 1998)).

¶ 36 We need not resolve the conflict in this case because Smith was also convicted of felony murder, which does not require a finding of premeditation. *See State v. Thornton,* 187 Ariz. 325, 334, 929 P.2d 676, 685 (1996); *State v. Lujan,* 124 Ariz. 365, 370, 604 P.2d 629, 634 (1979); *see also State v. Styers,* 177 Ariz. 104, 110, 865 P.2d 765, 771 (1993). Smith does not challenge the felony murder convictions on appeal.

## B. SENTENCING ISSUES

### 1. CONSTITUTIONALITY OF THE DEATH SENTENCE

¶ 37 As a preliminary matter, it is undisputed that Smith killed the Tannehills and, therefore, *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), are satisfied.

¶ 38 In capital cases, we independently review the trial court's findings of aggravating and mitigating circumstances to determine if the death penalty is appropriate. A.R.S. § 13–703.01(A) (Supp.1997). The trial court found four aggravating factors in this case: 1) two people were killed, A.R.S. § 13–703(F)(8) (Supp.1997); 2) the crime was committed in expectation of pecuniary gain, A.R.S. § 13–703(F)(5); 3) the crime was especially cruel as to Mrs. Tannehill, A.R.S. § 13–703(F)(6); and 4) the victims were more than 70 years old, A.R.S. § 13–703(F)(9). Smith does not challenge the (F)(8) finding, and it is clearly supported by the evidence.

### a. Pecuniary Gain

¶ 39 This aggravating factor is present when, "the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13–703(F)(5). This factor exists when pecuniary gain is "a motive, cause or impetus for the murder and not merely the result of the murder." *State v. Spears,* 184 Ariz. 277, 292, 908 P.2d 1062, 1077, *cert. denied,* 519 U.S. 967, 117 S.Ct. 393, 136 L.Ed.2d 308 (1996). Also, "[w]hen the defendant comes to rob, the defendant expects pecuniary gain and this desire infects

all other conduct of the defendant." *State v. LaGrand,* 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987). Any claim that the defendant did not intend to kill before the robbery is irrelevant. *See State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990).

¶ 40  The trial court found that Smith went to the victims' trailer armed with a gun and large knife with the intent to rob them. He had no job and no money. Smith attacked the Tannehills, stole their property, then beat them again and slit their throats when he thought they were getting up from the first attack. The victims did not pose a threat to Smith after he had stolen their property and he could easily have robbed them without killing them. Smith's claim that he acted in an impulsive rage when he killed the Tannehills was not supported by the evidence. He had demonstrated the ability to control his anger in the past.

¶ 41  It is undisputed that Smith came to rob the Tannehills. He admits this in his Opening Brief, Appellant's Opening Br. at 13, and in closing argument he admitted that he premeditated the robbery. Tr. of Apr. 23, 1997, at 66. Smith did not kill the Tannehills and then decide to rob them as an afterthought. He came to rob, and his desire for pecuniary gain infected his conduct. *See LaGrand,* 153 Ariz. at 35, 734 P.2d at 577. Smith attacked them and, by his own account, killed them when he believed they were resisting his attempts to rob them. Mr. Tannehill was disabled and used a cane. Smith was considerably larger than both victims, was armed with two weapons, and had already beaten them.

¶ 42  Smith argues that his only motive was to rob and the murders occurred only after the victims resisted. He does not offer any authority to support his argument that when victims resist a robbery and are killed for it, pecuniary gain does not exist. Smith wanted the Tannehills' property and he killed them to get it. The evidence supports the finding of pecuniary gain for both murders beyond a reasonable doubt.

**b. Especially Heinous, Cruel or Depraved**

¶ 43  This aggravating factor is phrased in the disjunctive, so if any one of the three factors is found, the factor is satisfied. *State v. Stokley,* 182 Ariz. 505, 517, 898 P.2d 454, 466 (1995). Cruelty contemplates the mental anguish and physical pain of the victim before her death. *State v. Murray,* 184 Ariz. 9, 37, 906 P.2d 542, 570 (1995) (quoting *State v. Walton,* 159 Ariz. 571, 586, 769 P.2d 1017, 1032 (1989)). "Cruelty is found when the 'victim [is] conscious at the time of the offense in order to suffer pain and distress.'" *State v. Spreitz,* 190 Ariz. 129, 147, 945 P.2d 1260, 1278 (1997) (alteration in original) (quoting *State v. Amaya-Ruiz,* 166 Ariz. 152, 177, 800 P.2d 1260, 1285 (1990)). Mental anguish is found when the victim "experiences significant uncertainty as to [her] ultimate fate." *Murray,* 184 Ariz. at 37, 906 P.2d at 570. It also exists where a victim witnesses the killing of a family member before she herself is killed. *State v. Kiles,* 175 Ariz. 358, 371, 857 P.2d 1212, 1225 (1993).

¶ 44  The trial court found that the state had proved cruelty beyond a reasonable doubt for Mrs. Tannehill, but not for Mr. Tannehill. Sufficient proof did not exist that Mr. Tannehill was conscious after the initial blows to his head. The surgically implanted plastic plate in his head was shattered in the attack. The medical examiner could not determine the point at which the plate shattered. It could have happened with the first blow, killing him or at least rendering him unconscious. Mr. Tannehill did not have any defensive wounds. We agree that the state did not prove cruelty for Mr. Tannehill.

¶ 45  As to Mrs. Tannehill, the trial court based its finding of cruelty on: 1) defendant's own evidence that he only knocked her down initially and, therefore, she was conscious, and 2) the presence of defensive wounds on her forearms, which showed she was alive during the attack and had the opportunity to fear for her life and her disabled husband's life.

¶ 46  Smith characterizes the trial court's finding of cruelty as speculative. We disagree. As the trial court stated, "[t]here had to have been sheer terror in her mind as she experienced the Defendant's attacks on her

and her husband." Sp. Verdict at 5. Mrs. Tannehill watched her elderly, disabled husband try to defend them by grabbing at Smith's gun, which then fired. She saw Smith beat her husband with the gun before she herself was beaten. Using Smith's own version of the facts, he struck her again when he saw she was getting up from the first beating. This evidence, combined with defensive wounds, supports a finding of cruelty as to Mrs. Tannehill.

### c. Age of Victims

¶ 47 Smith asserts that the age of the victims is an unconstitutional aggravating factor because it takes into account whom the defendant killed rather than the propensities of the defendant. However, Smith points to no constitutional provision to support this assertion.

¶ 48 We find that the age of a victim is an appropriate aggravating factor because a rational basis exists for it. By adopting the (F)(9) factor, the legislature determined that the young and old are especially vulnerable and should be protected. It is not irrational for the legislature to conclude that murders of children and the elderly are more abhorrent than other first-degree murders. Thus, in the absence of sufficient mitigating factors, murders of this sort should be punished more severely. In addition, the age of the victim is relevant to an inquiry into the defendant's characteristics and propensities. Those who prey on the very young or the very old are more dangerous to society.

¶ 49 Smith does not dispute that the state proved beyond a reasonable doubt that both victims were more than 70 years old. We uphold both (F)(9) aggravators.

### d. Statutory Mitigation

¶ 50 The trial court did not find statutory mitigation and Smith does not challenge this on appeal. The only statutory mitigating factor alleged by Smith was A.R.S. § 13–703(G)(1) ("The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."). Smith alleged that drugs, alcohol, and mental and emotional disorders caused significant impairment.

¶ 51 We agree with the trial court that the evidence is insufficient to establish the existence of the (G)(1) mitigating factor. First, we do not believe that Smith was impaired by drugs or alcohol at the time of the murders. His own statements to Detective Rice were that he was not intoxicated before the murders, but he had been taking methamphetamine after the murders. The evidence does not support a finding that Smith was under the influence of drugs or alcohol during the murders.

¶ 52 Second, we agree with the trial court that Smith likely has a personality disorder, but this did not cause significant impairment. "Character or personality disorders alone are generally not sufficient to find that defendant was significantly impaired." *State v. Murray*, 184 Ariz. 9, 42, 906 P.2d 542, 575 (1995). Smith was both able to appreciate the wrongfulness of his actions and had the ability to conform his conduct to the requirements of the law.

¶ 53 Smith did not prove he suffered any physical brain damage. Although he presented testimony of head injuries, tests showed he had normal neurological function and a normal IQ.

¶ 54 Smith planned the murders and robbery. Evidence shows that he then covered up his actions in these crimes. For example, he removed the license plate from his motor home and threw away the bloody weapons and clothing. The evidence shows that Smith appreciated the wrongfulness of his conduct.

¶ 55 That Smith can conform his conduct to the requirements of the law is evidenced by his lack of prior serious convictions. He has one misdemeanor conviction for DUI. In addition, witnesses testified that Smith could control his temper and walk away from an altercation. Smith has not proved this mitigator.

### e. Non-statutory Mitigation

¶ 56 The trial court next considered all non-statutory mitigating factors offered by Smith and found eight of them. In addition, the trial court found non-statutory impaired mental capacity from the evidence offered for the (G)(1) statutory mitigator, and stated Smith was impaired, "but not significantly so." Sp. Verdict at 9. We agree with these findings.

¶ 57 Smith alleged the following fifteen non-statutory mitigating factors: 1) lack of prior felony or serious criminal history; 2) love of and for his family; 3) long-term addiction to drugs and alcohol; 4) remorse; 5) substantial use of and impairment by drugs and alcohol prior to the homicide; 6) cooperation with law enforcement; 7) unusual stress prior to the homicide; 8) behavioral and personality disorders and long-term effects of head injuries; 9) good father and family man; 10) victims' actions precipitated violent response and homicide; 11) newfound religious beliefs; 12) lack of future dangerousness and ability to be rehabilitated; 13) artistic talent; 14) dysfunctional family background; and 15) pretrial incarceration conduct.

¶ 58 The trial court found that Smith proved the following eight non-statutory factors by a preponderance of the evidence: 1) lack of prior felony or serious criminal history; 2) love of his son (but not his family); 3) long-term addiction to drugs and alcohol; 4) cooperation with law enforcement; 5) behavioral and personality disorders and long-term effects of head injuries; 6) newfound religious beliefs; 7) dysfunctional family background; and 8) controlled conduct in court hearings (but not pretrial incarceration conduct). The trial court concluded these mitigating factors were not sufficiently substantial to call for leniency "in light of the overwhelming aggravating factors." Sp. Verdict at 13. Smith does not challenge the trial court's findings of non-statutory mitigating factors, but challenges instead the weighing process.

¶ 59 We have independently reviewed the trial court's findings of aggravation and mitigation and agree with those findings. Upon independent weighing, we conclude that the mitigation, considered individually and collectively, is not sufficiently substantial to warrant leniency.

### f. Constitutionality of the Death Penalty

¶ 60 Smith makes a number of constitutional challenges to the death penalty that have previously been rejected by this court: 1) cruel and unusual punishment; 2) death sentences are arbitrary; 3) proportionality review; 4) the jury, not the judge, should decide death sentences; and 5) prosecutorial discretion for seeking death penalty. We continue to reject these arguments.

¶ 61 In addition, Smith argues that because life imprisonment without parole, as an alternative to the death penalty, did not exist when *State v. Gillies*, 135 Ariz. 500, 662 P.2d 1007 (1983), was decided, this "should further limit the class of defendants for whom Death is appropriate." Assuming he asks this court, and not the legislature, to define death penalty eligibility, his argument is without merit.

¶ 62 Finally, Smith argues that Arizona's death penalty is unconstitutional because it fails to provide a vehicle at the time of execution to accommodate changed behavior while incarcerated. He notes that under *State v. Watson*, 129 Ariz. 60, 628 P.2d 943 (1981), if the defendant has an independent basis for resentencing, intervening conduct may be considered. *See also State v. Richmond*, 180 Ariz. 573, 580, 886 P.2d 1329, 1336 (1994). Smith argues that without such an independent basis for resentencing, such claims cannot be made under either state or federal post-conviction procedures. This, he says, is contrary to the statement in *Gillies* that "[i]f there is validity to appellant's claim, the avenues for post-conviction relief, both state and federal, are not closed to him." *Gillies*, 135 Ariz. at 509, 662 P.2d at 1016.

¶ 63 But *Gillies* did not acknowledge the validity of such an independent claim and Smith fails to make an argument in support

of it even if the avenues of post-conviction relief are closed. We thus reject it.[2]

## IV. DISPOSITION

¶ 64 We affirm Smith's convictions and sentences for both counts of first-degree murder, armed robbery, and first-degree burglary, including both sentences of death.

THOMAS A. ZLAKET, Chief Justice, CHARLES E. JONES, Vice Chief Justice, STANLEY G. FELDMAN, Justice, and RUTH V. McGREGOR, Justice, concur.

---

**2.** Such a claim, even if valid, presents ripeness problems. A court cannot know whether a defendant will in the future have another basis for resentencing. Nor can a court know whether in the years ahead the evidence would support a finding of good behavior.