IN THE SUPREME COURT OF THE STATE OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR- 99-0536-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR-96-04691 |
| ANTOIN JONES, | ) | |
| | ) | |
| Appellant. | ) | |
| _____ | ) | **O P I N I O N** |

Appeal from the Superior Court in Maricopa County
The Honorable Stephen A. Gerst, Judge
CONVICTIONS AND ALL SENTENCES EXCEPT SENTENCE OF DEATH
AFFIRMED

Janet A. Napolitano, Attorney General                                                          Phoenix
        By:     Kent E. Cattani, Chief Counsel
                Capital Litigation Section
                Dawn M. Northup, Assistant Attorney General
Attorneys for State of Arizona

James J. Haas, Maricopa County Public Defender                                       Phoenix
        By:     Stephen R. Collins, Deputy Public Defender
                Edward F. McGee, Deputy Public Defender
Attorneys for Antoin Jones

FELDMAN, Justice

¶1        On December 16, 1997, a jury found Antoin Jones (Defendant) guilty of first-degree premeditated murder, kidnapping, and two counts of sexual assault of a minor.   He was sentenced to death on the murder charge, in addition to several noncapital sentences.  Because the trial judge sentenced Defendant to death for the murder, direct appeal to this court is automatic.  A.R.S. § 13-703.01. We have jurisdiction pursuant to Arizona Constitution article VI, §5(3), A.R.S. § 13-4031, and Rule 31.2(b), Arizona Rules of Criminal Procedure.

**FACTS**

¶2        On April 16, 1996, not long after her twelfth birthday, the victim disappeared from a park in Glendale, Arizona.  Her body was found the next day in a dumpster behind an abandoned bar in Phoenix.  Her hands had been bound with one of her socks, and the other sock was tied around her throat.  She was covered in blood and clothed only in a T-shirt and training bra, which had been pushed up over her breasts.  In addition to massive head wounds, her body bore many lacerations and contusions, including two stab wounds to her throat.  She had also been sexually assaulted.

¶3        Defendant was a suspect almost immediately, primarily because several items belonging to him were found under the victim's body, including a time slip from the fast food restaurant where he worked and a receipt with his shift manager's pager number on it.  After interviewing the shift manager and her brother Danny, who was a friend of Defendant, Detective Olsen paged Defendant on April 24 and asked him to come to the police station.  Defendant arrived at about 10:00 p.m. with his girlfriend, Vanessa, and their infant child in tow.  Detectives Olsen and Morris interviewed him and ultimately decided to hold him for further questioning.  He was read the *Miranda* warnings, and questioning continued until he requested counsel, at which point the questioning ceased.

¶4        After detectives informed Defendant they were seeking a warrant to obtain a sample of his blood, he was allowed to use the telephone and visit with Vanessa for about twenty minutes. Shortly after 3:00 a.m., Detective McIndoo took Defendant downstairs to await the phlebotomist.

Shortly after 4:00 a.m., McIndoo took Defendant back upstairs and explained he could not discuss the case with him unless Defendant initiated the discussion. After Defendant spoke with his mother, he made taped statements to McIndoo. He admitted being at the scene and committing an act of necrophilia but implicated Danny as the killer.

¶5 Vanessa originally told detectives that she knew nothing of the crime. She later recanted that statement and told them Defendant had confessed the killing to her, recounting it in vivid detail and even going so far as to take her to the dumpster to view the body and retrieve some evidence. Defendant apparently did not tell her he had also raped the victim.

## PROCEDURAL HISTORY

¶6 Defendant was convicted of one count of first-degree premeditated murder; one count of kidnapping with intent to inflict death, physical injury, or a sexual offense; one count of sexual assault by virtue of nonconsensual intercourse; and one count of sexual assault by anal penetration. With the exception of first-degree premeditated murder, all counts were charged as class two felonies and first-degree dangerous crimes against children. Defendant was also originally charged with one count of sexual assault by foreign object penetration, of which he was acquitted, and one alternative count of felony murder, which was subsequently dropped. The trial judge imposed a death sentence on the murder count in addition to several noncapital sentences and a restitution award.

## DISCUSSION

A.    Trial issues

     1.    **Whether the trial judge abused his discretion by admitting Defendant's post-*Miranda* statements to McIndoo**

¶7 Defendant argues that in obtaining his post-*Miranda* statements, the state violated his rights to silence, counsel, and due process guaranteed by the Fifth and Fourteenth Amendments to

the United States Constitution and article II, §§ 4, 10, and 24 of the Arizona Constitution.[1]  Defendant

maintains that those statements should have been suppressed because they were made after he had

requested a lawyer and because he had not reinitiated contact with the detectives.  In reviewing a waiver

of the rights to counsel and silence, courts consider the totality of the circumstances.  *See Edwards*

*v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1884 (1981).

### a.    Standard of review

¶8           The standard of review on admissibility of a defendant's statements has been deemed

clear and manifest error.  *State v. Eastlack*, 180 Ariz. 243, 251, 883 P.2d 999, 1007 (1994).  We find

little authority indicating quite how manifest an error must appear to be so clear as to require reversal.[2]

We thus find it much more helpful to think in terms of an abuse of discretion standard.  Abuse of discretion

was discussed at length in *State v. Chapple*:

> [T]he phrase [abuse of discretion] as a whole has been interpreted to
> apply where the reasons given by the court for its action are clearly unten-
> able, legally incorrect, or amount to a denial of justice.  Similarly, a
> discretionary act which reaches an end or purpose not justified by, and
> clearly against, reason and evidence "is an abuse." . . .  Something
> is discretionary because it is based on an assessment of conflicting proce-
> dural, factual or equitable considerations which vary from case to case
> and which can be better determined or resolved by the trial judge, who
> has a more immediate grasp of all the facts of the case, an opportunity
> to see the parties, lawyers and witnesses, and who can better assess the
> impact of what occurs before him.  Where a decision is made on that
> basis, it is truly discretionary and we will not substitute our judgment
> for that of the trial judge; we will not second-guess.  Where, however,
> the facts or inferences from them are not in dispute and where there are
> few or no conflicting procedural, factual or equitable considerations,
> the resolution of the question is one of law or logic.  Then it is our final

---

[1] Defendant also alleges violation of his Sixth Amendment right to counsel, but that right does not attach until formal proceedings are instituted.  *See Massiah v. United States*, 377 U.S. 201, 204-05, 84 S.Ct. 1199, 1202-03 (1964).

[2] We might paraphrase Justice Stewart's oft-quoted words: "I shall not today attempt further to define the kinds of [error] I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so.  But I know it when I see it, and [any error] involved in this case is not that."  *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683 (1964) (Stewart, J., concurring).

responsibility to determine law and policy and it becomes our duty to "look over the shoulder" of the trial judge and, if appropriate, substitute our judgment for his or hers.

135 Ariz. 281, 297 n.18, 660 P.2d 1208, 1224 n.18 (1983) (citations omitted). Clear and manifest error, whatever it may mean, is really shorthand for abuse of discretion, and that is the term we will use.

### b. Reinitiation/waiver

**¶9** When a suspect invokes his right to a lawyer, all questioning must cease. *Edwards*, 451 U.S. at 481, 101 S.Ct. at 1883. However, if the suspect reinitiates contact with the police, he waives his rights and questioning can continue. *State v. Smith*, 193 Ariz. 452, 458 ¶ 22, 974 P.2d 431, 437 ¶ 22 (1999); *see also Oregon v. Bradshaw*, 462 U.S. 1039, 1043-44, 103 S.Ct. 2830, 2833-34 (1983). In *Bradshaw*, the Court held that the defendant's question, "Well, what is going to happen to me now?" evinced "a desire for a generalized discussion about the investigation." *Id.* at 1045, 103 S.Ct. at 2835. The defendant was held to have reinitiated contact and thus waived his invocation of the right to counsel. Thus, an explicit statement waiving *Miranda* is not required for a defendant to make a valid waiver of his rights. *North Carolina v. Butler*, 441 U.S. 369, 375-76, 99 S.Ct. 1755, 1758-59 (1979).

**¶10** The basic facts involving reinitiation are these: Both parties agree that the police informed Defendant he was in custody and read him the *Miranda* warnings shortly after midnight on April 25, 1996. They also agree that Defendant asserted his right to counsel several times shortly after 2:15 a.m. The requests actually occur in a one-minute running exchange between Defendant and McIndoo, during which McIndoo answered Defendant's questions. Defendant said, "I still want a lawyer," to which McIndoo replied "OK" before leaving the room. At approximately 2:40 a.m., detectives informed Defendant they were seeking a court order to draw blood; they served him with a copy of the order at 3:04 a.m. Defendant again requested a lawyer, but the detectives informed him that they would not call one for him. Defendant then asked for a telephone directory, and McIndoo got one for him.

5

However, two minutes later, when detectives moved him downstairs to another room, ostensibly to await a phlebotomist, Defendant had not yet looked up a lawyer's number.

¶11      The room downstairs had no videotape equipment, so we must rely on McIndoo's testimony to understand what transpired. Defendant asked what was going to happen, asked about Danny's name on the warrant and why he (Defendant) was being questioned. He continued to ask about potential penalties for murder and about Danny. In response to McIndoo's statement that Defendant probably already knew what had happened, Defendant eventually told McIndoo he had been there. McIndoo reminded Defendant several times that because he had invoked *Miranda*, McIndoo could only talk with him if Defendant specifically requested to speak to him.

¶12      At some point, Defendant allegedly wore McIndoo down to the point that he was willing to explain to Defendant that Danny was also subject to the order authorizing blood samples. Defendant repeatedly asked McIndoo what penalty people get for murdering someone, asking whether it was a *couple of years*. McIndoo initially replied that it was not really a couple of years and that he did not want to tell Defendant the exact penalties as he did not want Defendant to think he was being threatened. Finally, however, McIndoo explained that the potential sentence for murder ranged from the death penalty to, he supposed, as little as a couple of years.

¶13      Defendant kept telling McIndoo that he wanted to talk to him. McIndoo said he could not talk with Defendant because Defendant had asked for an attorney, that he could only do so if Defendant specifically asked to talk to him. Defendant replied that first he wanted to talk to his mother, then he wanted to talk to McIndoo to tell him what had happened. McIndoo therefore made arrangements to go back upstairs to the room with the videotape equipment.

¶14      At about 4:00 a.m., after returning upstairs, Defendant was allowed to talk to his mother, after which he made a taped statement to McIndoo. He told McIndoo that Danny borrowed his car, abducted the victim, had sex with her, killed her, and made Defendant have sex with her corpse the next day. Defendant explained that the only semen found in the victim was his because Danny wore a condom, and the only fingerprints found were his because Danny wore gloves. Defendant said he

6

lied to Vanessa when he told her he killed a girl, and that he took her to the dumpster only to see what Danny had done. He also stated that Danny covered the victim with a board and put a box over her head. The phlebotomist appeared only after this exchange, at which time Defendant was taken back downstairs to have a blood sample drawn.

¶15    No waiver of the request for counsel will be found where police activity rises to the level of actual questioning, or its functional equivalent, which the interrogator should know is likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689-91 (1980). In making this determination, we focus on the defendant's perspective rather than police intent. *Arizona v. Mauro*, 481 U.S. 520, 526-27, 107 S.Ct. 1931, 1935 (1987).

¶16    Defendant argues that he did not voluntarily initiate the post-*Miranda* discussion. He contends the detectives employed the warrant as a tool to get him to talk. The warrant, in conjunction with McIndoo's statement that Defendant probably already knew what happened, caused Defendant to start asking questions about the case. This conduct, he says, was the functional equivalent of questioning. Furthermore, he alleges the police knew or should have known that they had created an interrogation environment and that serving the warrant was likely to elicit an incriminating response. The state answers that it had no reason to believe serving Defendant with the warrant was likely to elicit an incriminating response because Danny was still a suspect at that point in time and Defendant continually expressed his wish to talk to McIndoo.

¶17    The trial judge found that the untaped exchange between Defendant and McIndoo was not the functional equivalent of questioning. *Innis* demonstrates that mere subtle coercion is not equivalent to interrogation and that compulsion beyond that inherent in custody is required. *See State v. Stanley*, 167 Ariz. 519, 524, 809 P.2d 944, 949 (1991) (police telling defendant about discovering bloody items and probable death of family was not functional equivalent of questioning). At the voluntariness hearing, the trial judge noted that McIndoo's depiction of his untaped interactions with Defendant were uncontradicted and corroborated by the taped discussion and statements Defendant made later. The judge accepted McIndoo's version of the events. The record thus supports the findings that Defendant specifically

7

requested to speak with McIndoo, initiated the discussion, and said that after he first talked to his mother, he wanted to tell McIndoo what had happened. This is precisely what he did. We therefore find no abuse of discretion and affirm the finding that Defendant initiated his post-*Miranda* remarks.

### c. Taping and waiver

¶18 We are, however, troubled by the fact that this reinitiated conversation was not recorded, while the interrogation that preceded it and the confession that followed were. The fact that the initial waiver was not taped subjected the state to unnecessary problems because it gives rise to suspicion. It would be a better practice to videotape the *entire* interrogation process, including advice of rights, waiver of rights, questioning, and confessions. This has been recommended by the Arizona Capital Case Commission and more recently by the Illinois Commission on Capital Punishment.[3] In addition, supreme courts in Alaska[4] and Minnesota[5] have required that interrogation of suspects be electronically recorded and have placed restrictions on the use of unrecorded statements. A Texas law states that oral statements by an accused in custody are generally inadmissable unless they are recorded.[6] Recording the entire interrogation process provides the best evidence available and benefits all parties involved because, on the one hand, it protects against the admission of involuntary or invalid confessions, and

---

[3] The Arizona Capital Case Commission Interim Report recommended that the "Attorney General develop a protocol for all law enforcement agencies in Arizona for the recording by law enforcement of all advice of rights, waiver of rights, and questioning of suspects in criminal cases when feasible to do so." The Arizona Capital Case Commission Interim Report, July 30, 2001, at 23.

The Illinois Commission on Capital Punishment's fourth recommendation is a detailed section on recording interrogations. Recommendation 4 states: "Custodial interrogations of a suspect in a homicide case occurring at a police facility should be videotaped. Videotaping should not include merely the statement made by the suspect after interrogation, but the entire interrogation process." Illinois Commission on Capital Punishment, Chapter 2 - Police and Pretrial Investigations, Recommendation 4, at 24-28.

[4] *See Stephan v. State*, 711 P.2d 1156, 1162 (Alaska 1985).

[5] *See State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994).

[6] Tex. Code Crim. Proc. art. 38.22 (Vernon 1999).

on the other, it enables law enforcement agencies to establish that their tactics were proper. Sometimes, of course, it might not be possible to record a statement, but statements that have not been recorded should be repeated to the suspect on tape and his or her comments recorded.[7]

¶19        Preferable practice aside, in the instant case there is no reason to disturb the trial judge's discretionary finding. We caution, however, that judges should certainly consider gaps in a tape in deciding issues of waiver and voluntariness.

### d.        Knowing and intelligent waiver

¶20        A suppression hearing was held to determine the voluntariness of Defendant's statements. The waiver of counsel must be made voluntarily, knowingly, and intelligently. *Edwards,* 451 U.S. at 482, 101 S.Ct. at 1884; *State v. Cornell,* 179 Ariz. 314, 322, 878 P.2d 1352, 1360 (1994). The trial judge concluded that Defendant reinitiated contact and made a voluntary, knowing, and intelligent waiver of his right to counsel. The test is whether, under the totality of circumstances, a defendant's statements were products of coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."); *State v. Lee*, 189 Ariz. 590, 601, 944 P.2d 1204, 1215 (1997).

¶21        Pointing to the totality of the circumstances, Defendant claims he did not knowingly and intelligently waive his rights. Defendant had no criminal record and was inexperienced with the criminal justice system. There was evidence placing him on the border of retardation. These factors,

---

[7] The Illinois Commission on Capital Punishment's report has two sections dealing with situations in which a defendant's statement has not been videotaped. Recommendation 5 states: "Any statements by a homicide suspect which are not recorded should be repeated to the suspect on tape, and his or her comments recorded." Recommendation 6 states: "There are circumstances in which videotaping may not be practical, and some uniform method of recording such interrogations, such as tape recording, should be established. Police investigators should carry tape recorders for use when interviewing suspects in homicide cases outside the station, and all such interviews should be audiotaped." Illinois Commission on Capital Punishment, Chapter 2 - Police and Pretrial Investigations, Recommendations 5 and 6, at 28-29.

Defendant contends, made a knowing, intelligent waiver less likely. Because the detectives ceased questioning but remained otherwise unresponsive to his requests for counsel, Defendant argues that he did not believe his rights would be respected and therefore he could not knowingly waive them.

**¶22** But Defendant obviously understood the right to counsel because he exercised it. Furthermore, Defendant exhibited no signs of mental impairment while in custody;[8] nor did he present evidence of it at the voluntariness hearing. Even if Defendant was operating under some degree of perceptual impairment, he need not have foreseen and understood every possible consequence of waiving his Fifth Amendment privileges as long as "he at all times knew he could stand mute and request a lawyer, and that he was aware of the state's intention to use his statements to secure a conviction." *Moran v. Burbine*, 475 U.S. 412, 422, 106 S.Ct. 1135, 1141 (1986). Moreover, there is no evidence that detectives knew about or took advantage of Defendant's mental limitations. *See State v. Amaya-Ruiz*, 166 Ariz. 152, 166, 800 P.2d 1260, 1274 (1990) (defendant's limited cognitive ability did not preclude knowing and intelligent waiver when defendant was read his rights, claimed to understand them, and answered anyway). The detectives merely ceased questioning Defendant after he asserted his rights; they were not required to get an attorney for him. *State v. Knapp*, 114 Ariz. 531, 538, 562 P.2d 704, 711 (1977).

**¶23** We therefore affirm the finding that Defendant made a voluntary, knowing, and intelligent waiver and freely reinitiated his conversation with McIndoo after earlier requesting counsel. We find no abuse of discretion in admitting Defendant's post-*Miranda* statements to McIndoo.

---

[8] The state notes Defendant's ability to explain the presence of his papers in the dumpster while shifting the blame onto Danny, as well as his ability to use a telephone, as examples of his intellectual prowess. Defendant's physical and mental states are to be considered, but they are not enough, by themselves, to tip the balance against finding a voluntary waiver. *Smith*, 193 Ariz. at 457 ¶ 14, 974 P.2d at 436 ¶ 14.

**2.    Whether the trial judge abused his discretion by denying Defendant's motion to suppress blood evidence**

¶24    Defendant argues that his blood was taken in violation of his Fourth, Fifth, and Fourteenth Amendment rights under the United States Constitution, and article II, §§ 4 and 8 of the Arizona Constitution. He asserts that the results of the blood testing should have been inadmissible at trial. He bases this claim on the fact that the warrant was issued at 2:35 a.m. on April 25, 1996, while officers testified they did not believe they had probable cause until sometime after 3:00 a.m., when McIndoo took Defendant's statement.

¶25    Issuance of warrants to obtain identifying physical characteristics is governed by A.R.S. § 13-3905, which requires a showing of the following factors: (1) reasonable cause for believing a felony has been committed, (2) evidence of identifying characteristics from an individual that may contribute to identifying the perpetrator, and (3) evidence that cannot otherwise be obtained by the investigating officer. This was the standard applied by the magistrate. Defendant acknowledges that warrants to obtain identifying physical characteristics may issue for less than probable cause, but he correctly argues that despite the fact they are included within the scope of A.R.S. § 13-3905(G), blood samples involve a bodily invasion that may only be justified on probable cause.

¶26    The state maintains that blood may be drawn on a basis short of probable cause. For this proposition, the state relies on *State v. Rodriguez*, 186 Ariz. 240, 921 P.2d 643 (1996), and *State v. Stanhope*, 139 Ariz. 88, 676 P.2d 1146 (App. 1984). The *Rodriguez* court expressly confined its discussion to print evidence. 186 Ariz. at 247, 921 P.2d at 650. *Stanhope* also did not deal with detention to draw blood. 139 Ariz. at 91-92, 676 P.2d at 1149-50. Nor is the question of blood samples treated in *State v. Grijalva*, 111 Ariz. 476, 533 P.2d 533 (1975). Thus, the state's reliance on these cases is misplaced.

¶27    Drawing blood is a bodily invasion and therefore a search under the Fourth Amendment. Thus, probable cause is the standard that must be met. The United States Supreme Court has held that in the absence of exigent circumstances, such as dissipation of alcohol from the bloodstream, the

11

taking of blood samples requires a warrant founded on probable cause to pass Fourth Amendment muster. *Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 1835 (1966). The trial judge found that even under a probable cause standard, the magistrate did not abuse his discretion in granting the order for Defendant's blood. The judge correctly reviewed the magistrate's findings for abuse of discretion. *See State v. Buccini*, 167 Ariz. 550, 810 P.2d 178 (1991). Defendant was living near the dumpster where the victim was found, and he regularly threw boxes and boards in it. The victim was found under a board, with a box covering her head. Moreover, the magistrate and the judge were entitled to give weight to the fact that Defendant's time slip and receipt were directly underneath the victim. Thus, we believe there was probable cause for the search and the judge committed no error in denying Defendant's motion to suppress.

### 3.  Whether the trial judge abused his discretion by admitting certain autopsy photographs

¶28    Evidentiary rulings on allegedly gruesome or cumulative photographs are ordinarily reviewed for abuse of discretion. *State v. Doerr*, 193 Ariz. 56, 65 ¶ 41, 969 P.2d 1168, 1177 ¶ 41 (1998); *Chapple*, 135 Ariz. at 289-90, 660 P.2d at 1216-17. Defendant argued that the only real issue for trial was the perpetrator's identity, and that the autopsy photographs and certain crime scene photographs were irrelevant, cumulative, and so gruesome that it was error to admit them. The trial judge admitted them on the grounds that they might be relevant to premeditation and the brutal nature of the crime. Photographs are relevant when they aid the jury in understanding an issue in the case. *Chapple*, 135 Ariz. at 287-89, 660 P.2d at 1214-16. However, the judge later ruled that premeditation was not a contested issue.[9] The degree of brutality involved is irrelevant to the determination of guilt or innocence.

¶29    The photographs included a close-up of the victim's buttocks, showing injuries to the anus and resultant hemorrhaging; the lower half of the victim's face and torso from above, depicting

---

[9] Premeditation was held not to be an issue because two different weapons were used to hit the victim in the head and stab her in the neck; further, the victim's hands were tied behind her back.

lacerations, puncture wounds, and her training bra pushed over her chest; a close-up of the victim's torso, showing lacerations and puncture wounds to the middle chest and throat; another close-up of the victim's torso but closer and from a different angle, with a ruler indicating the scale of the wounds; a close-up of the victim's pelvic region, showing vaginal injuries and resultant hemorrhaging; the victim's shaved head and upper torso from above, showing multiple deep wounds to the frontal lobe; and the victim's defleshed cranium, showing a large frontal impact hole and approximately sixty fragments. Although the judge did not expressly find any individual photograph gruesome, common sense dictates that he would not have conducted a Rule 403 analysis on the question of unfair prejudice had he not thought the photographs raised such an issue. *See* Rule 403, Ariz.R.Evid.

¶30        Reviewing the photographs, we conclude some of them are both graphic and disturbing, particularly given the nature of the crime and age of the victim. They might satisfy the test of technical relevance insofar as they depict elements of the state's case in chief; however, there is nothing in some of the images that could not be made abundantly and equally clear through testimony and diagrams. Thus, we believe some of the photographs were at best cumulative and at worst offered in an attempt to incense the jurors.

¶31        Photographs with probative value are admissible, among other reasons, to depict how a crime was committed and to help the jury understand a witness's testimony. *See Chapple*, 135 Ariz. at 287-88, 660 P.2d at 1214-15. They may be received if they have a bearing on any issue in the case, even if they tend to arouse prejudice, *but only* if their probative value is not substantially outweighed by the danger of unfair prejudice. *See* Rule 403, Ariz.R.Evid. "[I]f the photographs have no tendency to prove or disprove any question *which is actually contested*, they have little use or purpose except to inflame and would usually not be admissible." *Chapple*, 135 Ariz. at 288, 660 P.2d at 1215 (emphasis added).

¶32        The images in question are relevant but do not appear to be probative of any fact actually in dispute except for corroborating Vanessa's testimony. Defendant put on an all-or-nothing defense and for all intents and purposes contested only the identity of the killer. It is true that the state "cannot

13

be compelled to try its case in a sterile setting." *State v. Bocharski*, 200 Ariz. 50, 56 ¶ 25, 22 P.3d 43, 49 ¶ 25 (2001) (quoting *Chapple*, 135 Ariz. at 289-90, 660 P.2d at 1216-17). Given the physical evidence described by the medical examiner, some of the contested images in this case shed little light on the perpetrator's identity.

¶33 Thus, introduction of such photographs may well have exceeded any need to prove a contested issue. But error, "be it constitutional or otherwise, is harmless if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict." *State v. Bible*, 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993). In this case, the jury actually acquitted Defendant of one of the sexual assault counts, suggesting that the jurors made reasoned decisions based on the evidence presented, rather than lashing out in an emotional response to the photographs. However, we need not decide that here because if the introduction did exceed what was permissible, it would be harmless error. Given the strength of the evidence, we conclude any improperly admitted photographs could not have affected the verdict in this case. Nevertheless, the principles articulated in *Chapple* still stand, and cumulative, non-essential, and gruesome photographs should not be admitted in evidence.

### 4. Whether the trial judge committed reversible error by "death-qualifying" the jurors on voir dire

¶34 The trial judge submitted a questionnaire to the prospective jurors. Among other things, it asked, "If you have any beliefs or feelings about the subject of the death penalty that would affect your ability to serve as a fair and impartial juror, please explain below." Defendant argues that by death-qualifying prospective jurors, the judge essentially impaneled a jury that was more likely to convict. This claim has previously been rejected by us and the United States Supreme Court. *Buchanan v. Kentucky*, 483 U.S. 402, 414-16, 107 S.Ct. 2906, 2913-14 (1987); *State v. Hoskins*, 199 Ariz. 127, 141-42 ¶¶ 49-50, 14 P.3d 997, 1011-12 ¶¶ 49-50 (2000).

¶35 Largely because of the structure of our current capital sentencing scheme, Defendant asks us to reconsider the issue and overrule our cases allowing death-qualification. Because Arizona

14

juries have not decided the punishment,[10] he argues that there is no need to worry about getting a single juror to "properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial." *Lockhart v. McCree*, 476 U.S. 162, 175-76, 106 S.Ct. 1758, 1766 (1986). The fact that a death-qualified jury might be more likely to convict is hardly a revelation — it is a matter of simple common sense that there is more likelihood of nullification when those who oppose the death penalty and know that it may be imposed in the event of a conviction are allowed to serve. But nothing has been presented to cause us to reconsider the law as it stands in *Hoskins*.

### 5. Jury selection

¶36 Defendant also argues that two jurors were excused for no reason other than their opposition to the death penalty. However, because Defendant only made general objections to qualification, he failed to preserve any challenge to the dismissal of those two individuals.[11] *State v. Kayer*, 194 Ariz. 423, 432 ¶ 24, 984 P.2d 31, 40 ¶ 24 (1999). The trial judge did not commit fundamental error by excusing the two jurors.

### 6. Whether the trial judge erred by declining to instruct the jury on second-degree murder

¶37 Defendant argues the trial judge erred in refusing an instruction on the lesser-included offense of second-degree murder. In capital cases, the judge must instruct the jury on noncapital, lesser-included offenses that are supported by the evidence. *See Beck v. Alabama*, 447 U.S. 625, 627, 100 S.Ct. 2382, 2384 (1980); *Murray*, 184 Ariz. at 34, 906 P.2d at 567. But the key to this rule is "whether the jury could rationally fail to find the distinguishing element of the greater offense." *Id*. (quoting *State v. Krone*, 182 Ariz. 319, 323, 897 P.2d 621, 625 (1995)). In *Murray*, we concluded that the jury

---

[10] *But see Ring v. Arizona*, 2002 WL 1357257, ___ U.S. ____, 122 S.Ct. 2428 (2002).

[11] One juror was excused because of financial hardship and general opposition to the death penalty; another expressed doubts about her ability to fairly consider the case because she had a twelve-year-old child, was a child advocate, and did not believe in the death penalty.

could not have rationally convicted the defendant of anything less than premeditated murder because the victims were made to lie down on the floor before being individually executed with different weapons. 184 Ariz. at 34, 906 P.2d at 567. When a defendant denies committing the murder *and* no evidence provides a basis for a second-degree murder charge, a judge may properly refuse to instruct on second-degree murder. *Id.* We reaffirmed this proposition in *State v. Sharp*, 193 Ariz. 414, 422-23 ¶¶ 28-29, 973 P.2d 1171, 1179-80 ¶¶ 28-29 (1999).

¶38 Defendant flatly denied killing the victim. In addition, the evidence suggests only premeditation. First, Vanessa testified that Defendant said he drove directly to the dumpster after abducting the victim. She also said that Defendant said he told the victim he could not let her go because she might talk. It was also uncontested that the killer switched weapons at least once, using both a knife and a socket wrench to stab the victim in the throat and hit her in the head and chest. Defendant argued only misidentification; he presented no evidence that the victim was killed in a manner that could have supported a second-degree murder conviction. Thus, the trial judge did not err in refusing to give the second-degree murder instruction.

## B.    Sentencing issues

¶39 The trial judge denied Defendant's request for a jury trial on the penalty phase of his case. Defendant argues that the denial violated his right to a jury trial, due process, equal protection, and freedom from cruel and unusual punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article II, §§ 2, 4, 13, 15, 23, and 24 of the Arizona Constitution.

¶40 Defendant was sentenced pursuant to A.R.S. § 13-703, which sets the procedure for sentencing in a case in which the state seeks the death penalty. That procedure requires the trial judge to find the statutory factors that, if found to exist, qualify a defendant for capital punishment. The procedure was declared constitutional in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047 (1990), but placed in doubt by the United States Supreme Court's opinion in *Apprendi v. New Jersey,* 530

16

U.S. 466, 120 S.Ct. 2348 (2000). We recently described the procedure in detail, pointing out that *Apprendi* had not overruled *Walton* and that we therefore were required by the Supremacy Clause to uphold the Arizona sentencing procedure. *State v. Ring*, 200 Ariz. 267, 279-80 ¶ 44, 25 P.3d 1139, 1151-52 ¶ 44 (2001).

**¶41** The United States Supreme Court has now vacated our opinion in *Ring*. The Court held that A.R.S. § 13-703 is unconstitutional insofar as it permits the trial judge to find the aggravating factors that permit imposition of the death penalty. *Ring v. Arizona*, 2002 WL 1357257 * 16, ___ U.S. ___, ___, 122 S.Ct. 2428, ___ (2002). We must therefore hold that the trial judge in the present case erred in applying A.R.S. § 13-703.

**¶42** The Court remanded *Ring* to us, and we must decide what is to be done on remand. *See* Rule 31.23(c), Ariz.R.Crim.P. Given the *Ring* decision, this defendant and all others on direct appeal must either be resentenced or their death sentence reduced to life with or without parole. In some cases, there may be other issues, such as the possibility that the jury found the aggravating circumstance[12] or the state's contention of harmless error.[13] The decision is difficult because Arizona law now prescribes no procedure for sentencing or resentencing in capital cases. It is therefore necessary to ask for briefing and argument on remand questions.

**¶43** This case, however, is but one of many affected by the holding in *Ring*. We therefore believed it best to consolidate this case and all others not yet final on direct appeal[14] for supplemental

---

[12] A case, for example, in which the aggravating factor was multiple homicides and the defendant was found guilty by jury verdict of each of the homicides. *See* A.R.S. § 13-703(F)(8).

[13] There can be no such claim in the present case. Two aggravating circumstances were found — the victim's age and cruel, heinous, and depraved conduct. While Defendant conceded the age factor, he contested the cruel, heinous, and depraved factor. He was sentenced to death on the basis of both. It is, of course, impossible to find harmless error when, under *Ring*, Defendant was denied a jury trial on one of the two bases for the sentence.

[14] The possible application of *Ring* to cases that are final and that come before our courts on post-conviction matters will be considered separately.

briefing and argument on the issues involving capital sentencing procedures. We filed an order to that effect on June 27, 2002.

¶44        In the interim, before final decision of the *Ring* issue, we have decided it would be in the best interests of all — the justice system, defendants, and victims — to issue opinions on the guilt issues in all cases that have been argued and submitted to the court for decision, including those in which we have concluded the verdict and judgment of guilt should be affirmed. This opinion is the first of that type.

¶45        Thus, we end the discussion of sentencing issues at this point. If a defendant is to be resentenced or his sentence is to be reduced, all other sentencing issues are moot and need not be decided. If it later appears that the other issues are not moot, they may be raised and considered when appropriate. This opinion is therefore not a final disposition of the case and the time for filing a motion for reconsideration or for post-conviction proceedings has thus not begun to run. In our discretion, however, suspending all contrary rules, any motion for reconsideration appropriately directed to the issues decided in this opinion should be filed as provided by the existing rules. *See* Rule 31.18, Ariz.R.Crim.P.

## C.        Alleged constitutional defects raised to avoid preclusion

¶46        To avoid potential procedural default and preserve review, Defendant brings numerous constitutional challenges to Arizona's death penalty scheme, citing to both the federal and state constitutions.

1.        Arizona's death penalty is *per se* cruel and unusual punishment, thus violating the Due Process and Cruel and Unusual Punishment clauses.

2.        By requiring the death penalty to be imposed whenever an aggravating circumstance is found without any mitigating circumstances also being found, Arizona's death penalty statute violates the Due Process clauses.

3.        Arizona's death penalty statute is unconstitutional because it does not allow defendants the opportunity to death-qualify judges.

18

4.     Arizona's death penalty statute fails to provide adequate guidance to the sentencing court.

5.     Because Arizona's death penalty statute requires defendants to prove their lives should be spared, it violates the Due Process and Cruel and Unusual Punishment clauses.

6.     The Arizona death penalty statute is unconstitutional because it does not require the state to prove that death is the appropriate penalty.

7.     The especially heinous, cruel, or depraved aggravating factors are unconstitutionally vague and fail to provide notice of what conduct may qualify a crime as a capital murder; therefore, they violate the Due Process and Cruel and Unusual Punishment clauses.

8.     Arizona's statutory scheme for considering mitigation evidence limits full consideration of such evidence. Consequently, it violates the Due Process and Cruel and Unusual Punishment clauses.

9.     Putting the decision to seek the death penalty within the prosecutor's discretion is standard-less and unconstitutional, violating the Due Process and Cruel and Unusual Punishment clauses.

**¶47**     We have previously rejected each of these challenges in a variety of cases and see no reason to change those rulings. *See Van Adams*, 194 Ariz. at 422-23 ¶¶ 54-55, 984 P.2d at 30 ¶¶ 54-55.


## DISPOSITION

**¶48**     For the foregoing reasons, we affirm Defendant's convictions and all sentences except the sentence of death.

_____
STANLEY G. FELDMAN, Justice

19

CONCURRING:

_____

CHARLES E. JONES, Chief Justice


_____

RUTH V. McGREGOR, Vice Chief Justice


_____

REBECCA WHITE BERCH, Justice


_____

NANETTE M. WARNER, Judge*


Due to a vacancy on the court, pursuant to article VI, section 3 of the Arizona Constitution, the Honorable Nanette M. Warner, Judge of the Superior Court in Pima County, was designated to sit on this case.