NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Plaintiff/Appellee*,

*v.*

JOHN ASHLEY JAMES, *Defendant/Appellant*.

No. 1 CA-CV 25-0192

FILED 03-03-2026

Appeal from the Superior Court in Mohave County
No. S8015CR202100621
The Honorable Douglas R. Camacho, Judge

**AFFIRMED**

COUNSEL

Mohave County Attorney's Office, Kingman
By Matthew J. Smith, Ryan H. Esplin, Jason Mitchell
*Counsel for Plaintiff/Appellee*

Harris & Winger, P.C., Flagstaff
By Chad Joshua Winger
*Counsel for Defendant/Appellant*

---

## MEMORANDUM DECISION

Presiding Judge Samuel A. Thumma delivered the decision of the Court, in which Judge Andrew J. Becke and Judge Kent E. Cattani joined.

---

**T H U M M A**, Judge:

¶1      John Ashley James appeals from an order involuntarily committing him to a secure state mental health facility. That order was entered after (1) the superior court found him to be not competent and not restorable, but responsible for a serious offense, and (2) a jury found him to be dangerous beyond a reasonable doubt (Title 13 Commitment). *See* Ariz. Rev. Stat. (A.R.S.) §§ 13-4517 and 13-4521 (2026).[1] The court rejects James' challenge to the constitutionality and applicability of the Title 13 Commitment scheme, as well as his challenge to the admission of an expert's opinion that he is dangerous. Although the superior court erred by admitting multiple gruesome images of the murder victim's body at the dangerousness trial, that error does not require reversal. Thus, the Title 13 Commitment order is affirmed.

### FACTS AND PROCEDURAL HISTORY

¶2      James was indicted for first-degree murder for stabbing his stepfather to death in their shared home. The superior court found James incompetent to stand trial and ordered him to submit to competency restoration treatment at the Arizona State Hospital and, later, the Yavapai County Restoration to Competency Program. Although he received the maximum 21 months of treatment, James was never restored to competency. *See* A.R.S. § 13-4515(A); *see also* Ariz. R. Crim. P. 11.5(b)(2)(C). The court found him not competent and not restorable when the treatment period ended in December 2023.

¶3      When making the not competent and not restorable finding, the court granted the State's request to start procedures for a Title 13 Commitment. The court set the first hearing for January 2, 2024, the day after the Title 13 Commitment procedures became effective. *See* 2022 Ariz. Sess. Laws, ch. 352, § 7 (2nd Reg. Sess.) (S.B. 1310); 2023 Ariz. Sess. Laws,

---

[1] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

ch. 130, § 4 (1st Reg. Sess.) (H.B. 2689). The court appointed a guardian ad litem and scheduled further proceedings. James unsuccessfully moved for dismissal on jurisdictional and constitutional grounds.

¶4        At an evidentiary hearing under A.R.S. § 13-4521(A), the court found the State carried its burden to show, by evident proof or great presumption, that James committed a serious offense. The court set a jury trial under A.R.S. § 13-4521(E) to address the issue of James' dangerousness. The court appointed Drs. Mark Harvancik and Laurence Schiff, the same professionals who evaluated James for competency, to evaluate him for dangerousness. After the evaluations, Dr. Schiff concluded that James is not dangerous so long as he is medicated, while Dr. Harvancik concluded that James is dangerous even when medicated.

¶5        James filed a pretrial motion in limine to preclude Dr. Harvancik's testimony, arguing the doctor was not statutorily qualified and that his opinions were inadmissible under Arizona Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). As trial began, the court ruled that both doctors were statutorily qualified and that the parties could raise Rule 702 challenges during the doctors' testimony.

¶6        At trial, Dr. Harvancik testified about his education and experience before explaining that he relied on treatment records to assess dangerousness because James was actively hallucinating at both his competency and dangerousness evaluations. Dr. Harvancik testified that records showed James was diagnosed with schizophrenia and antisocial personality disorder, and that he continued to experience psychotic symptoms—specifically, hallucinations and paranoia—even when on high-dose antipsychotic medications.

¶7        James objected under Rule 702, challenging Dr. Harvancik's knowledge, his reliance on collateral sources and his failure to cite a scientific methodology. The court ruled that Dr. Harvancik had proper knowledge and he properly relied on records, but required the State to provide further foundation about his methodology. In providing that further foundation, Dr. Harvancik testified that when a patient's behavior precludes a mental health professional from administering a psychological test for dangerousness, it is standard practice to assess dangerousness based on the patient's records. He concluded that James' records showed that he was dangerous even when consistently medicated, and that he needed to be committed to a secure state mental health facility. James raised no further Rule 702 objections. Dr. Schiff then testified to his opinion, without objection by the State, describing a successful interaction with

James and concluding that records and his psychotic symptoms did not show a propensity for violence.

¶8            James moved in limine to prevent the State from using photographs and video of the murder victim's body. He argued that the images were not relevant to show future dangerousness, and, alternatively, that the images' gruesomeness made them unfairly prejudicial. The State responded that the video only briefly showed the victim, only a few photographs were being offered and the selected photographs reflected James' dangerousness because they show the multiple, intentional stab wounds he inflicted on the victim, including severe facial wounds. The court denied James' motion to preclude, other than precluding one photograph the court found cumulative.

¶9            The jury received one video of the crime scene, five photographs of the victim's body at the crime scene, and eight photographs of the autopsy of the victim, all in color. The one-minute video, from a police officer's body camera, shows the officer entering a house and finding the victim. The video briefly shows the victim's supine body with blood on his chest, his face and the floor around him. The crime scene photographs show: (1) a distant view of the victim's body; (2) a close-up view of the victim's body, showing blood on his chest and face along with pooled and spattered blood around him; (3) a similar close-up view from a different angle; (4) a similar close-up view from the side, showing the victim's complete head and additional pooled blood and (5) a close-up view of hands pulling up the victim's shirt to show a cut on his torso. The autopsy photographs show: (1) hands pulling apart a cut on the victim's finger; (2) a close-up view of the victim's face showing cuts at the top of his nose and the side of his face; (3) a close-up view of hands pulling the victim's nose away from his face at the cut; (4) another close-up view of the victim's face showing the cuts; (5) a close-up view of a tool entering the cut on the side of the victim's face and exiting through the interior of his upper lip; (6) a close-up view of the same tool in the same position, with hands pulling back the victim's upper lip to show the exit point; (7) a close-up view of a cut on the victim's ear and (8) a close-up view of a tool stuck in a cut near the victim's armpit.

¶10           For the crime scene photographs, a police officer testified to finding the victim's body when he responded to James' mother's 911 call. Regarding the autopsy photographs, the medical examiner described what they showed, stated that the finger wound could be defensive, and concluded that the victim died from multiple sharp force injuries that caused him to aspirate blood.

¶11 James' mother testified that James has a long history of mental illness, including diagnoses of schizophrenia, bipolar disorder and paranoia. She stated that, although doctors had told her he should always be medicated, he had been without medication for the three months before the murder, which affected his behavior. She reported that he would pace, go outside and yell in a panic and talk to dead people. Although at the trial she denied seeing him kill the victim, she stated otherwise in her interview with the police.

¶12 In video clips admitted at trial, James' mother told police that on the day of the murder, she had locked James out of the house to stop his repeated entering and exiting. When he banged on the door and asked for shoes, she opened the door to give him a pair, and he forced his way in, knocking her to the ground. He then encountered the victim. His mother saw him making stabbing motions and heard him asking "Mason," a name he had been mentioning for some time, to leave him alone. She then saw him put a knife in the kitchen sink and leave the house. Police found two clean knives in the kitchen, and they apprehended James outside the house later that day.

¶13 After considering the evidence, the jury found, consistent with A.R.S. § 13-4521(E), that the State proved beyond a reasonable doubt that James is dangerous and should be committed to a secure state mental health facility. The court, consistent with A.R.S. § 13-4521(F)-(H), then dismissed the criminal charge without prejudice and ordered James committed to a secure state mental health facility, licensed under A.R.S. § 36-425.06, for education, care, supervision and treatment to render him either competent or non-dangerous. The Title 13 Commitment order would last for James' natural life or until he became competent or non-dangerous. *See* A.R.S. § 13-4521(G)(2).

¶14 This court has jurisdiction over James' timely notice of appeal from the Title 13 Commitment order under A.R.S. §§ 12-120.21 and -2101(A)(10)(a).

## DISCUSSION

¶15 James apparently is not currently in custody under the Title 13 Commitment order. In a special action filed with this court in 2024, it emerged that the State never transferred James from jail to a "secure state mental health facility" as required by the Title 13 Commitment order because no such facility exists. As a result, in a September 2024 order, this court ordered that James be released from jail pending his commitment to

a secure state mental health facility. The next day, it appears, the State instituted commitment proceedings under Title 36 that led to James' placement at the Arizona State Hospital. The court in that matter ordered that if he is released in the Title 36 proceedings, his public-fiduciary guardian may direct his placement until commitment to a secure state mental health facility becomes possible.

¶16  Regardless of where James is physically being held, the Title 13 Commitment order remains in place and compels his placement in a secure state mental health facility when possible. Thus, resolution of this appeal from the Title 13 Commitment order affects James and it is appropriate for this court to decide it. Further, this court may consider even moot issues that are of great public importance or are capable of repetition yet evading review. *Cardoso v. Soldo*, 230 Ariz. 614, 616-17 ¶¶ 5-7 (App. 2012).

## I. James' Challenges to the Title 13 Commitment Scheme's Constitutionality and Application Fail.

¶17  James first challenges the constitutionality and application of the Title 13 Commitment scheme. This court reviews the validity of statutes de novo, construing them as constitutional if possible. *In re Leon G.*, 204 Ariz. 15, 19 ¶ 9 (2002) (citing cases).

¶18  The Title 13 Commitment scheme provides that, when a defendant who is found not competent and not restorable is charged with a serious offense (including first degree murder, A.R.S. § 13-706(F)(1)(a)), any party may request a trial to determine whether the defendant is dangerous and should be involuntarily committed. *See* A.R.S. § 13-4517(A)(4). For commitment, the court must first find that the proof is evident or the presumption great that the defendant committed a serious offense. *See* A.R.S. § 13-4521(A). If the court makes that finding, mental health experts must examine the defendant. *See* A.R.S. § 13-4521(D). Then, at a trial to the court (or a jury, on request), the State must prove beyond a reasonable doubt that the defendant is dangerous and should be involuntarily committed. *See* A.R.S. § 13-4521(E). If the fact finder determines that the State has carried its burden of proof, the court must dismiss the criminal charges without prejudice and order the defendant committed to a secure state mental health facility for education, care, supervision and treatment to render the defendant either competent or non-dangerous. *See* A.R.S. § 13-4521(F). The resulting commitment, subject to Title 36 procedures, may last no longer than the presumptive sentence the defendant could have received for the highest charged offense (and will

count as presentence incarceration), and must end if the defendant becomes either competent or non-dangerous. *See* A.R.S. § 13-4521(G)(1), (2), (H), (K). Upon expiration of the commitment order, the State or the director of the secure state mental health facility may petition for further treatment under Title 36 or for the appointment of a guardian under Title 14. *See* A.R.S. § 13-4521(I).

**¶19**        James contends that the Title 13 Commitment scheme is unconstitutional, both facially and as applied, because it forces an incompetent defendant to undergo a criminal trial without due process of law and the assistance of counsel, in violation of the Fifth and Sixth Amendments to the United States Constitution, as applicable to the states through the Fourteenth Amendment. James has not shown that the Title 13 Commitment scheme is unconstitutional, either facially or as applied.

**¶20**        Although the Title 13 Commitment scheme arises from criminal charges and is found in Arizona's Criminal Code, it defines no crime and imposes no punishment. *See Carson v. Gentry*, ___ Ariz. ___, ___, ¶¶ 78, 80-83, 86, 574 P.3d 205, 221-23 (2025). It is, instead, a civil mechanism designed to promote mental health treatment and protect the public. *See id.* The Sixth Amendment's right to counsel for "criminal prosecutions" therefore does not apply. *See* U.S. Const. amend. VI; *see also In re MH-2008-000867*, 225 Ariz. 178, 179-80 ¶¶ 2, 7 (2010) (the Sixth Amendment's confrontation clause does not apply in involuntary commitment proceedings under Title 36).

**¶21**        The Title 13 Commitment scheme provides—consistent with the constitutional guarantee of due process—that the defendant has the right to legal representation. *See* A.R.S. § 13-4517(A)(4); *accord In re Leon G.*, 204 Ariz. at 20 ¶ 15 (citing *Vitek v. Jones*, 445 U.S. 480, 500 (1980)). Here, James was represented by counsel for the entire proceedings. And given the nature of the proceedings, the court is unpersuaded by James' arguments that the representation was not meaningful because his incapacity forced his attorney to "go[] it alone," without his input. His incapacity is what warranted the representation. James has not shown any violation of due process with respect to his representation.

**¶22**        Nor has James shown that the Title 13 Commitment scheme otherwise violates due process. A civil commitment scheme tracks the constitutional guarantee of due process if it is sufficiently narrow and imposes proper procedures and evidentiary standards. *See In re Leon G.*, 204 Ariz. at 19 ¶ 8. The Arizona Supreme Court recently held that the Title 13 Commitment scheme "is commensurate with the civil commitment

schemes" for sex offenders upheld in *Kansas v. Hendricks*, 521 U.S. 346 (1997) and *Martin v. Reinstein*, 195 Ariz. 293 (App. 1999). *See Carson*, ___ Ariz. at ___ ¶¶ 86, 80-81, 574 P.3d at 222-23. The Title 13 Commitment scheme ensures that counsel must be appointed to represent the defendant; that the defendant may be committed only if he or she is proved at an evidentiary hearing to have committed a serious offense; that the defendant is allowed to retain a mental health expert to examine him or her and present the expert's evaluation at trial; that the defendant may not be committed unless proved to be dangerous beyond a reasonable doubt; and that the defendant may not be committed indefinitely. *See* A.R.S. §§ 13-4517(A)(4), -4521; *In re Leon G.*, 204 Ariz. at 20 ¶ 15. Here, James was afforded counsel, all hearings were properly conducted and all findings were made consistent with the statutory burdens of proof and other requirements.

¶23        James argues in passing that the Title 13 Commitment scheme violates the right to equal protection because "[h]e does not stand on an equal footing with any other criminal defendant." That argument fails. *Martin* explained that the constitutionality of the civil commitment scheme for sexual offenders was determined under rational basis review, and that the scheme's application to "persons who have been convicted of, charged with but found incompetent to stand trial for, or acquitted by reason of insanity of, one or more violent sexual acts" was a rational classification designed to protect the public. 195 Ariz. at 309-13 ¶¶ 49-63. So too here, the interests of public protection provide a rational basis for applying the Title 13 Commitment procedures to criminal defendants charged with serious offenses who are found to be not competent, not restorable and dangerous.

¶24        Finally, in oral argument before this court, James' counsel conceded that *Carson v. Gentry*, decided by the Arizona Supreme Court after briefing in this matter, rejected his ex post facto arguments. *See* ___ Ariz. at ___ ¶¶ 74-86, 574 P.3d at 221-23. For these reasons, James' challenges to the constitutionality and applicability of the Title 13 Commitment statutes fail.

## II.        The Superior Court Did Not Abuse Its Discretion by Admitting Dr. Harvancik's Opinion on James' Dangerousness.

¶25        James argues that the superior court abused its discretion by admitting Dr. Harvancik's opinion on James' dangerousness into evidence under Rule 702.[2] Rule 702 unquestionably applies to these types of

---

[2] Because James does not reprise on appeal his argument in superior court that Dr. Harvancik failed to qualify as a "mental health expert" under

proceedings. *See* A.R.S. § 13-4521(C) (stating Arizona Rules of Evidence apply at the dangerousness trial in a Title 13 Commitment case); *Ariz. State Hosp./Ariz. Cmty. Prot. & Treatment Ctr. v. Klein*, 231 Ariz. 467, 472-73 ¶¶ 21, 24 (App. 2013) (where the legislature broadly provided for application of the Arizona Evidence Rules at discharge proceedings for persons committed as sexually violent, Rule 702 applied). The decision to admit expert testimony under Rule 702 is reviewed for an abuse of discretion. *State v. Salazar-Mercado*, 234 Ariz. 590, 594 ¶ 13 (2014) (citing cases).

**¶26** Rule 702 is a gatekeeping rule under which the court must assess whether the proposed expert testimony is relevant, reliable and will assist the trier of fact. *See State ex rel. Montgomery v. Miller*, 234 Ariz. 289, 298 ¶¶ 19-21 (App. 2014). Under the rule, a witness qualified as an expert by "knowledge, skill, experience, training, or education" may testify in the form of an opinion if it is shown more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Ariz. R. Evid. 702.

**¶27** James' arguments turn on Rule 702(c)'s "reliable principles and methods" requirement. This requirement means that the expert "must be able to explain how his [or her] methods, reasoning and opinions are based on 'an accepted body of learning or experience.'" *Miller*, 234 Ariz. at 298 ¶ 23 (citation omitted). To evaluate the evidence on this point, the court may look to the factors discussed in *Daubert*, 509 U.S. at 593-95:

---

A.R.S. § 13-4521(D), that argument is waived. *See Carrillo v. State*, 169 Ariz. 126, 132 (App. 1991) (citing cases).

> (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique or theory is generally accepted within the relevant scientific community; (4) the known or potential rate of error of the technique or theory when applied; and (5) the existence and maintenance of standards controlling application of the technique.

*Miller*, 234 Ariz. at 299 ¶ 24. But these factors are non-exclusive. *Id.* And critically, "[n]o single *Daubert* factor is dispositive of the reliability of an expert's testimony, and not all of the *Daubert* factors will apply to 'all experts or in every case.'" *Id.* at 299 ¶ 25 (citation omitted).

**¶28**        James argues that Dr. Harvancik provided no testimony about his methodology's testing, peer review, general acceptance, error rate or standards. He also emphasizes that, although Dr. Harvancik identified several psychological tests for dangerousness, he did not evaluate James using those tests. James has shown no abuse of discretion.

**¶29**        Dr. Harvancik testified that he had to rely on James' extensive treatment records to assess his dangerousness because James' psychosis rendered him largely unable to cooperate at interviews. When James objected to the doctor's approach, the court permitted the State to lay further foundation. Dr. Harvancik then testified (with no further objection) that it is standard practice for mental health professionals to rely on records to determine an uncooperative patient's dangerousness based on his or her behavior patterns.[3] The evidence was sufficient to satisfy Rule 702(c)'s requirement of reliable principles and methods, as well as Rule 702(d)'s requirement for reliable application in the case. *See Miller*, 234 Ariz. at 299

---

[3] James notes Dr. Harvancik testified to being "real puzzled about the nature of the [Title 13 Commitment] statutes." The doctor's conception of the statutory scheme, however, had no impact on his ability to assess the factual issue of James' dangerousness. He testified he understood that task and performed it, explaining that he approached it "similar to how [he] would approach a competency evaluation with a particular emphasis on assessing for dangerousness."

¶ 24 (general acceptance in the relevant scientific community is among the non-exclusive factors relevant to the assessment of a method's reliability).

**¶30** James has not shown that the superior court abused its discretion by finding Dr. Harvancik's testimony admissible under Rule 702. As much as James argues the testimony was deficient, he had ample opportunity to challenge it through cross-examination and to present his own conflicting evidence, and the court properly instructed the jurors on the burden of proof and their ability to determine the weight and credibility of expert testimony. *See Miller*, 234 Ariz. at 298 ¶ 20 (citation omitted) ("'[C]ross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible [expert] evidence.'").

**III.    The Superior Court Abused Its Discretion by Admitting Multiple Images of the Murder Victim's Body, but that Error Does Not Require Reversal.**

**¶31** James' final argument is that the superior court abused its discretion by allowing the jury to consider what he describes as gruesome video and photographs of the murder victim's body. Admission of such evidence is reviewed for an abuse of discretion. *State v. Chapple*, 135 Ariz. 281, 290 (1983) (citing cases).

**¶32** Under the Arizona Rules of Evidence, the issues are (1) whether the video and photographs were relevant and (2) whether their probative value was substantially outweighed by a danger of unfair prejudice, needlessly presenting cumulative evidence or other mischief. *See* Ariz. R. Evid. 401 - 403. James argues a third inquiry—whether the video and photographs have "the tendency to incite passion or inflame the jury" – is required. Tracing to *Chapple*, 135 Ariz. at 288, Arizona courts have applied this "incite or inflame" inquiry in criminal, but not civil, cases. *See, e.g.*, *State v. Allen*, 253 Ariz. 306, 344 ¶ 126 (2022); *State v. Bocharski*, 200 Ariz. 50, 55 ¶ 21 (2001); *State v. Doerr*, 193 Ariz. 56, 64 ¶ 29 (1998); *State v. Bailey*, 160 Ariz. 277, 280 (1989). The State, however, has not argued the "incite or inflame" inquiry is inapplicable here. Given this briefing, and leaving for another day a more definitive resolution of whether *Chapple* applies in civil cases, the court addresses all three inquiries. The court concludes that the images' admission was error in any event.

**¶33** To start, the superior court properly could conclude images of the victim's body and wounds were minimally relevant. *See* Ariz. R. Evid. 401. The State had the burden to prove to the jury beyond a reasonable

doubt, A.R.S. § 13-4521(E), that James was "dangerous and should be involuntarily committed." A.R.S. § 13-4521(B).[4] The State argued that the images of the victim's body were relevant to the question of James' dangerousness because they showed the violence of his crime. The record supports a conclusion that the images were relevant. Although James argued he was not the killer, the manner in which the victim was attacked, as shown by the images, was relevant to the question of the killer's dangerousness. The relevance was, however, minimal, as evidence of any manner of murder typically will tend to show that the perpetrator is dangerous.

¶34        But the superior court abused its discretion in weighing the images' minimal relevance against their tendency to cause unfair prejudice, whether in the form of jury incitement, jury inflammation or otherwise. To be sure, the court has substantial discretion to weigh evidence's probative value against the potential for prejudice because neither factor is easily quantified. *See Hudgins v. Sw. Airlines, Co.*, 221 Ariz. 472, 481 ¶ 13 (App. 2009) (citing cases).  But where gruesome photographs' "only possible use . . . would have been to inflame the minds of the jury or to impair their objectivity," they should not be admitted because they create an undue risk of prejudice—particularly when they are cumulative of other evidence. *Chapple*, 135 Ariz. at 290. Stated differently, when "graphic and disturbing" images show nothing "that could not be made abundantly and equally clear" through other evidence, the images are "at best cumulative and at worst offered in an attempt to incense the jurors." *State v. Jones*, 203 Ariz. 1, 10 ¶ 30 (2002). In several criminal cases, the Arizona Supreme Court has found an abuse of discretion in admitting gruesome photographs of a dead victim's body. *See State v. Spreitz*, 190 Ariz. 129, 140-42 (1997) (superior court abused its discretion by admitting "unduly disturbing" photographs of the murder victim's severely decomposed body, that provided "little or no additional aid" to the medical examiner's clear testimony); *Chapple*, 135 Ariz. at 287-90 (superior court abused its discretion in admitting photographs of the murder victim's burned body, including a close-up of his skull with the bone cut away to show a bullet in the brain matter, when the manner of the victim's death was undisputed); *Bocharski*, 200 Ariz. at 55-56 ¶¶ 20, 24-27 (superior court properly admitted some photographs of the murder victim's body, but abused its discretion by admitting photographs of the victim's empty skull with a rod through it, which had "little tendency to establish any disputed issue in the case" and "were

---

[4] The court's previous determination under A.R.S. § 13-4521(A) that James committed the offense by evident proof or great presumption was not determinative of the inquiry under A.R.S. § 13-4521(E).

introduced primarily to inflame the jury"); *State v. Davolt*, 207 Ariz. 191, 208-09 ¶¶ 62-63 (2004) (superior court properly admitted graphic autopsy photographs as evidence on the disputed time and manner of the victims' deaths, but abused its discretion by admitting crime-scene photographs and video of the victims' burned bodies, which were "highly inflammatory" yet "of minimal probative value").

¶35 Here, although the medical examiner used the autopsy photographs in his brief testimony, nothing about his testimony required the photographs—his descriptions of the undisputed wounds could stand alone. The autopsy photographs were also repetitive. They showed the same close-up torso wound as one of the crime-scene photos, this time with a tool inserted (explained by the medical examiner as a tool to determine wound-path direction—a question not at issue). Further, they showed the same facial wounds multiple times. Although the depth of the wounds was relevant to the force of the killer's attack, the multiple views and manipulations to show the same—especially the image of the pulled-back nose and the two images of the facial cut run through with a tool—were cumulative and inflammatory.

¶36 The crime scene photographs were also repetitive, showing different views of the body and the surrounding blood pools. The State provided no explanation why the multiple views were needed, and the record does not show why a single image could not have sufficed to establish the scene's violence.

¶37 Given the minimal probative value of all the images, their significant tendency to unfairly prejudice the jury and their cumulative nature, the superior court erred by admitting nearly all of them for the jury's consideration. The court's preclusion of a single image was insufficient.

¶38 This conclusion of error, however, does not end the inquiry. The dangerousness trial was governed by the Arizona Rules of Civil Procedure. *See* A.R.S. § 13-4521(C). Under these rules, harmless error in admitting evidence does not require reversal. *See* Ariz. R. Civ. P. 61 ("Unless justice requires otherwise, an error in admitting . . . evidence . . . is not grounds for" reversal). "'[E]rror is harmless unless it is inconsistent with substantial justice or affects the substantial rights of the parties.'" *Paz v. City of Tucson*, 256 Ariz. 391, 401 ¶ 37 (App. 2023) (citation omitted). "'The improper admission of evidence is not reversible error if the jury would have reached the same verdict without the evidence.'" *Id.* (citation omitted).

"Reversible [error] 'will not be presumed but must affirmatively appear from the record.'" *Id.* (citation omitted).

¶39 The record does not show that the improper admission of the cumulative gruesome images constituted reversible error. The State's evidence shows that the jury would have reached the same decision even without the images. Separate from the images, the State presented substantial evidence that James has a long history of serious mental health issues, that he committed a violent murder while psychotic and that he remained psychotic despite extensive treatment and medication. On this record, the erroneous admission of the images does not require appellate relief. *See Paz*, 256 Ariz. at 401 ¶ 37; *cf. Davolt*, 207 Ariz. at 209 ¶ 64 (under the criminal standard for harmless error, articulated as whether it can be said beyond a reasonable doubt that the error did not affect the jury's verdict, the improper admission of graphic photographs did not require reversal given the other evidence of guilt); *Bocharski*, 200 Ariz. at 56-57 ¶¶ 28-34 (same); *Spreitz*, 190 Ariz. at 142 (same).

## CONCLUSION

¶40 The Title 13 Commitment order is affirmed.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**: JR

14